149 F.3d 494
 1998 Copr.L.Dec. P 27,799
 Douglas A. JOHNSON, doing business as Douglas Johnson &
Associates, Inc.; Professional Management Co.,
Plaintiffs-Appellees/Cross-Appellants,
v.
Theresa C. JONES; John C. Uznis; Uznis Deneweth Co., Defendants,
Daniel A. Tosch; Progressive Associates, Inc.,
Individually, Jointly and Severally,
Defendants-Appellants/Cross-Appellees.
 Nos. 96-1580, 96-1657.
 United States Court of Appeals,
Sixth Circuit.
 Argued Dec. 2, 1997.
Decided July 21, 1998.
 
 Christopher G. Manolis (argued and briefed), Richard P. Smith (briefed), Blake, Kirchner, Symonds, MacFarlane, Larson & Smith, Detroit, Michigan, for Defendants-Appellants/Cross-Appellees.
 Douglas P. LaLone (argued and briefed), Bernard J. Cantor (briefed), Harness, Dickey & Pierce, Troy, Michigan, for Plaintiffs-Appellees/Cross-Appellants.
 Carl J. Jarboe, Abbott, Nicholson, Quilter, Esshaki & Youngblood, Detroit, Michigan, for Defendant Jones.
 Before: MERRITT, BATCHELDER, and FARRIS,* Circuit Judges.
 BATCHELDER, Circuit Judge.
 
 
 1
 Plaintiff Douglas Johnson, an architect, brought this suit alleging, inter alia, that his architectural drawings were altered and used without his permission in violation of the Copyright Act, 17 U.S.C. §§ 102(a)(5) and (8), and the Lanham Act, 15 U.S.C. § 1125(a). Johnson brought his copyright infringement and false designation of origin claims against Defendants Theresa Jones, Daniel Tosch, Progressive Associates, Inc., John C. Uznis, and Uznis Denewith Co. In addition, Johnson's complaint alleged breach of contract and/or unjust enrichment for work done by Johnson, for which he was never paid.
 
 
 2
 The district court granted summary judgment in favor of Jones, Uznis, and Uznis Denewith on Johnson's Lanham Act claim, but after a bench trial, found Uznis, Tosch, Progressive Associates, and Uznis Denewith jointly and severally liable in the amount of $107,125 ($104,625 profit by Uznis and $2,500 profit by Tosch) for willful infringement of Johnson's copyrighted architectural drawings. The district court, however, awarded neither attorney's fees nor statutory damages under the Copyright Act. In addition, the district court found Tosch liable for the Lanham Act violation, but chose not to award damages because such an award would be duplicative of damages already awarded for the copyright infringement. The district court did, however, order Tosch to pay Johnson's attorney's fees under the Lanham Act, because his violation of the Act had been willful and deliberate.
 
 
 3
 Although the district court found Jones not to be liable for copyright infringement, it did find her liable for breach of implied contract (quantum meruit ). Consequently, the district court ordered Jones to pay damages in the amount of $19,966.98, which it determined to be the reasonable value of Johnson's services.
 
 
 4
 Each defendant filed a timely notice of appeal. In turn, Johnson filed a timely notice of cross-appeal as to: (1) the district court's computation of damages on his copyright claims, (2) the district court's decision not to award him statutory damages or attorney's fees under the Copyright Act, and (3) the district court's decision not to award Johnson actual damages, in addition to profits, for the copyright infringement. Jones, Uznis, and Uznis Denewith have since voluntarily dismissed their appeals, pursuant to FED. R.APP. P. 42(b), leaving only Tosch and Progressive Associates to appeal the district court's ruling as to copyright infringement and false designation of origin.
 
 
 5
 We now affirm the district court in every respect but one. Because the district court failed to award Johnson Tosch's gross revenue, as required by § 504(b) of the Copyright Act, we reverse and remand so that the district court can order an award that includes Tosch's gross revenue.
 
 I. BACKGROUND
 
 6
 Douglas Johnson, whose principal place of business is in Rochester Hills, Michigan, is licensed as an architect in Michigan, Arizona, and Maryland, and as a builder in Michigan. Defendant-Appellant Daniel Tosch, also licensed in Michigan, has been an architect since 1971 and is the owner of Defendant-Appellant, Progressive Associates, Inc. Defendant John C. Uznis is a licensed builder, and owner of Defendant Uznis Denewith Co. Defendant Theresa Jones is, in addition to being an ex-nun and a Ph.D., an experienced business woman who owns and operates a large automobile dealership.
 
 
 7
 This case arises out of Jones' desire to build her "dream house," complete with "1) a large sitting room outside the master bedroom; 2) a large kitchen with two sitting rooms, one for adults and the other for children; 3) 'his and hers' large walk-in closets in the master bedroom; 4) an exercise room; 5) children's bedrooms on the same floor as the master bedroom; 6) master bath with fireplace; 7) large entertainment room which could comfortably held [sic] 125 people; 8) a 'Superbowl;' party room; 9) a game room; 10) a six-car garage; and 11) a 'spectacular' spiral staircase from the foyer."
 
 
 8
 To that end, Jones first met with Johnson in July of 1993 and conveyed to him her idea to buy a house located at 1100 Orchard Ridge Road, in Bloomfield Hills, Michigan, which, with his help, she would turn into her dream home. Jones wanted the house ready by December 1994. Although Johnson promptly began working on this project, he and Jones were never able to agree on the terms of a contract. In fact, it was the delay caused by the prolonged contract negotiations that eventually caused Jones to fire Johnson and hire another architect and builder.
 
 
 9
 On July 15, 1993, Johnson presented Jones with the first contract, a standard American Institute of Architecture ("AIA") contract entitled, "Abbreviated Form of Agreement Between Owner and Architect." The AIA contract specifically provided, in article 6, section 6.1, that the architect shall be deemed author of the documents and other drawings prepared with respect to the project and shall retain all rights to said documents including copyrights. Section 6.1 further provided that the copyrighted drawings "shall not be used by the owner or others on other projects, for additions to this Project or for completion of this Project by others, unless the architect is adjudged to be in default under this agreement, except by agreement in writing with appropriate compensation to the Architect." (emphasis added).
 
 
 10
 Jones had not yet purchased the house on Orchard Ridge Road, but she was anxious to get the project moving. So, she asked Johnson to recommend a surveyor to do the mortgage and topographical survey of the property. During this time, Johnson had also begun working on a design for the house. Subsequently, on July 25, 1993, Johnson delivered to Jones his "Design Development Program," which outlined the necessary additions to, and remodeling of, the house. At that meeting, Johnson had expected to pick up a signed copy of the AIA contract, but was informed by Jones that her lawyer had not yet reviewed it. Nevertheless, Jones made it clear that she wanted Johnson to continue working. Johnson, therefore, continued working on the project under the assumption that Jones would eventually sign the contract he had given to her.
 
 
 11
 At a meeting on August 10, 1993, Jones asked Johnson to serve as the contractor in charge of the renovation. Johnson agreed to do the job, but informed Jones that he would have to supply her with a different contract that specifically covered "design/build" projects such as this. Shortly thereafter, Johnson delivered to Jones the second contract, an AIA contract entitled "Standard Form Agreements Between Owner and Design/Builder." Like the first contract, the second contract also contained a specific provision relating to ownership of the architectural drawings. The provision stated:
 
 
 12
 "The drawings, specifications and other documents furnished by the Design/Builder are instruments of service and shall not become the property of the Owner whether or not the project for which they are made is commenced. Drawings, specifications and other documents shall not be used by the Owner on other projects, additions to this project, or ... for completion of this Project by others, except by written agreement relating to use, liability and compensation."
 
 
 13
 (emphasis added).
 
 
 14
 After this meeting, Johnson began working on floor plans, as well as demolition plans and plans for the additions to the house. The demolition drawings, addition drawings, and site plan were all submitted to the City of Bloomfield Hills for approval.
 
 
 15
 On September 24, 1993, a meeting was scheduled between Johnson and Jones, at which Johnson expected Jones to sign the second contract. When he arrived, however, Johnson was told that Jones' lawyer, Timothy Stoepker, would be joining them. Stoepker explained that he was bringing in Tosch to work as Jones' "construction agent" to ensure that the house was being built properly. Stoepker further informed Johnson that Jones would not be signing the second AIA contract. Instead, Stoepker intended to write a new contract for the project. Despite the fact that no contract had yet been signed, Johnson was told to continue working on the project. Apparently, Jones wanted to avoid any weather related delays which could threaten the desired December 1994 completion date.
 
 
 16
 Five days later, Stoepker sent the third contract to Jones. This contract contained several new provisions, including one providing that "[u]pon payment by the Owner to the builder for the architectural drawings and specifications, the same shall be owned by the Owner." Stoepker met with Johnson sometime in October to discuss the third contract. Johnson expressed numerous concerns and, according to Stoepker's testimony, the two of them worked out a revised language for the contract.
 
 
 17
 Specifically, Johnson and Jones allegedly came to an agreement about the distribution of ownership rights in the architectural drawings after the completion of the project. Pursuant to their conversation, Stoepker rewrote the ownership provision as follows:"Architect shall retain ownership of drawings and specifications but Owner-Jones-shall be entitled to retain a set of drawings and specifications and may utilize same for any purpose she desires."
 
 
 18
 In response, Johnson sent an addendum outlining additional changes to the contract. Johnson's addendum made no reference to the ownership provision. Johnson claims that the omission was a mistake, and that he had intended to contest the ownership provision as Stoepker had written it.
 
 
 19
 Jones did not accept Johnson's addendum, and, as a result of the parties' inability to agree on contract terms, Johnson was terminated from the project. Subsequently, Tosch and Uznis were retained to work on the project as architect and builder, respectively. On November 12, 1993, Johnson delivered an invoice to Jones in the amount of $19,966.98, for unpaid services as of the date of his discharge. Jones testified that she had intended to pay the bill, but did not do so on the advice of her lawyer.
 
 
 20
 During one of the initial meetings with Uznis in early November, Tosch expressed concerns that Johnson's drawings had copyright notices affixed to them. According to Tosch, he refused to proceed until the copyright issue was resolved. A few days later, Tosch met with the city inspector, who informed him that he would need to submit new plans and apply for a new building permit, because the architect and builder who had originally submitted the plans was no longer on the project and the approvals were no longer valid. Tosch acquired Johnson's addition drawings, site plan, and demolition drawings from the city inspector, because the inspector had informed him that the review process for obtaining a new permit would go much faster if none of the drawings or specifications on the project was changed.
 
 
 21
 Tosch was now in possession of all of Johnson's architectural drawings and plans, some of which he had obtained from Jones, and others from the city inspector. Tosch took these drawings and plans to Uznis and restated his concerns about the copyright problem. Uznis promised to contact Stoepker to ask about the problem. Stoepker later called Tosch and told him that preliminary research showed that there was not a problem with authorship, because Jones was co-owner of the drawings. Stoepker promised to contact Tosch later with a final report. A couple of days later, Uznis called to say that Stoepker had called to assure him that everything was fine, and that there would be no copyright problems. Apparently, Stoepker had also promised to send Tosch a written confirmation that this was so. No such confirmation was ever sent.
 
 
 22
 Tosch then began to work on the project using Johnson's drawings. First, Tosch traced Johnson's floor plans and foundation plans. He then took the drawings and site plan that he had obtained from the city inspector, removed Johnson's name and seal, and replaced them with his own name and seal. Tosch gave the tracings and the re-labeled drawings to Uznis, who submitted them to the city inspector on November 22, 1993. The drawings were approved by the city inspector that same day.
 
 
 23
 Johnson did not discover that Tosch was using his drawings until he happened to visit the Orchard Ridge job site in January, 1994. At that time, Johnson observed a construction table covered with plans for the project. Upon approaching the table, Johnson found the plans that he had originally created spread out across the table. Johnson then filed this law suit.
 
 II. DISCUSSION
 
 24
 We review the district court's conclusions of law de novo. Waxman v. Luna, 881 F.2d 237, 240 (6th Cir.1989). We review a district court's findings of fact under the clearly erroneous standard of review. Thurman v. Yellow Freight Sys., Inc., 90 F.3d 1160, 1165 (6th Cir.1996) (citing Anderson v. Bessemer City, 470 U.S. 564, 573-75, 105 S.Ct. 1504, 84 L.Ed.2d 518 (1985)). A finding of fact will be clearly erroneous only when, although there may be some evidence to support the finding, "the reviewing court is left with the definite and firm conviction that a mistake has been committed." Id.
 
 A. Implied License
 
 25
 Original architectural works are normally subject to copyright protection, and may, therefore, form the basis for a copyright infringement suit. 17 U.S.C. §§ 102(a)(5) and (8); Robert R. Jones Associates v. Nino Homes, 858 F.2d 274, 276 (6th Cir.1988). Moreover, "[w]hile the copyright owner can sell or license his rights to someone else, section 204 of the Copyright Act invalidates a purported transfer of ownership unless it is in writing." Effects Associates, Inc. v. Cohen, 908 F.2d 555 (9th Cir.1990), cert. denied 498 U.S. 1103, 111 S.Ct. 1003, 112 L.Ed.2d 1086 (1991). Tosch disputes neither the validity of the copyright nor the absence of a written instrument transferring ownership. In addition, Tosch admits that he copied Johnson's drawings. Despite this, Tosch argues that he cannot be liable for copyright infringement because Johnson granted him an implied non-exclusive license to use the drawings for the Jones house.
 
 
 26
 Courts have held that the existence of an implied license to use the copyright for a particular purpose precludes a finding of infringement. See, e.g., Effects, 908 F.2d at 559; I.A.E., Inc. v. Shaver, 74 F.3d 768 (7th Cir.1996). It is also well-settled that a non-exclusive license is not a transfer of ownership, and is not, therefore, subject to the writing requirement of § 204. Effects, 908 F.2d at 558; 17 U.S.C. § 101. Thus, "[a] non-exclusive license may be granted orally, or may be implied from conduct." M. Nimmer and D. Nimmer, 3 NIMMER ON COPYRIGHT § 10.03[A], at 10-38 (1994). See also, Silva v. MacLaine, 697 F.Supp. 1423, 1430 (E.D.Mich.1988). Tosch cites Effects and Shaver in support of his claim that he has been granted an implied license, but, unlike the facts in those cases, the facts in this case do not demonstrate that Johnson ever granted Tosch an implied license to use the drawings.
 
 
 27
 In Effects, defendant, a movie-maker, asked plaintiff, a special effects company, to create footage to enhance action sequences in a film defendant was making. Unhappy with the footage provided by plaintiff, defendant paid only half of the expected amount. Plaintiff repeatedly demanded the balance of the payment, but defendant refused. Subsequently, defendant incorporated plaintiff's footage into the film and released the film to another company for distribution. The Effects Court held that plaintiff had granted defendant an implied non-exclusive license to incorporate the footage into the film and then distribute the film. Effects, 908 F.2d at 558-59.
 
 
 28
 The circumstances in Effects differ materially from those in the present case. First, the defendant in that case produced a letter of agreement stating that the footage was intended for inclusion into the movie. Second, the plaintiff in Effects delivered the footage directly to the defendant, without ever mentioning the issue of ownership of the copyright. Indeed, the district court in that case stated that "every objective fact concerning the transaction at issue supports a finding that an implied license existed." Id.
 
 
 29
 By contrast, almost every objective fact in the present case points away from the existence of an implied license. Johnson submitted two AIA contracts, both of which contained express provisions that he would retain ownership of his drawings, and that those drawings would not be used for completion of the Jones house by others, except by written agreement with appropriate compensation. These contractual provisions, although never signed by Jones, speak to Johnson's intent; they demonstrate that Johnson created the drawings with the understanding that he would be the architect in charge of the project. They further demonstrate that Johnson would not have allowed Tosch to finish the project using his drawings without a written agreement, and additional compensation.
 
 
 30
 Tosch makes much of the fact that Johnson did not object to the ownership provision drafted by Stoepker in the revised edition of the third contract. Johnson testified that his failure to object in the first instance was a mistake and that he had intended to do so. Based on the content of the prior contracts submitted by Johnson, we have no trouble believing him. In any event, one isolated instance of inaction, coming as it did just before the breakdown of negotiations, is not enough to outweigh Johnson's repeated expressions of intent that he retain ownership of his drawings.
 
 
 31
 The plaintiff in Effects, on the other hand, had always intended that the footage would be incorporated into the movie, and distributed therewith. The dispute in that case arose not from the manner in which the copyrighted material was used, but from the amount paid for the material. Tosch argues that the same is true of the present case. We disagree. The current dispute concerns more than the lack of compensation paid to Johnson; it also involves the way in which Johnson's drawings were used. It is one thing for an architect to allow the owner to hire someone else to build a house from the architect's plans. It is quite another for the architect to allow a competitor to come in and claim the architect's work as his own. Put simply, Johnson's drawings were used in a way he never intended-i.e., a rival architect claimed them as his own work and completed the Jones house without Johnson's involvement.
 
 
 32
 Moreover, Johnson did not deliver his drawings and site plan to Tosch. Rather, Tosch obtained some of the drawings from Jones, and others from the city inspector. Having acquired the drawings from other sources, Tosch cannot argue that his acquisition created an implied license. Indeed, the evidence demonstrates that Johnson was not even aware that his plans were being used until January, 1994, when he stopped by the Jones house job site.
 
 
 33
 Tosch's position finds no better support in Shaver. In that case, two construction companies formed a joint venture for the purpose of designing an air/cargo hangar for a local airport. The joint venture retained Shaver, an architect, to create schematic documents for the first phase of the four-phase hangar construction project. Shaver executed a contract with the joint venture stating that he would prepare the schematics for the price of $10,000. Shaver, 74 F.3d at 770. When he finished the schematics, he delivered them to the airport, the joint venture, and the other parties involved in the project. On the day the schematics were approved by the airport, the joint venture paid Shaver $5,000.
 
 
 34
 Although Shaver had hoped to execute further written contracts for the remaining phases of the project, the joint venture hired another architect to finish the project. After being informed that he was no longer involved, Shaver wrote a letter to the airport, stating that he was, "under the circumstances, no longer in a position to participate or contribute to the development of the ... Project." Id. at 771. The letter, enclosed with copies of Shaver's schematics, further stated, "We trust that our ideas and knowledge exhibited in our work will assist the Airport in realizing a credible and flexible use Cargo/Hangar facility." Id. A week later, however, Shaver informed the joint venture that he was still owed $5,000 on the contract, $887.29 for reimbursable expenses, and $7,000 for the purported "assignment" of his copyright on the schematics. Id. This was Shaver's first mention of payment for the assignment of his copyrights.
 
 
 35
 Thus, the facts in Shaver demonstrate three crucial elements missing from the present case: (1) a written contract precisely describing the work to be done and the price to be paid; (2) a clear expression of Shaver's intent that his schematics be used for the first phase of the project, and that his involvement in any later phases would need to be negotiated in separate contracts; and (3) payment (albeit less than was agreed upon) for the use of Shaver's schematics. While Shaver's contract was "clear, to-the-point, and unambiguous ... [in demonstrating] no expectation of a further role in the Project," Shaver, 74 F.3d at 771, there is no such valid contract in the present case. Indeed, Johnson submitted two contracts, each of which demonstrated his intent that his drawings not be used to finish the project without him. Although Shaver wrote a letter to the airport in which he acknowledged that his schematics would be used to finish the project, Johnson was not aware that his drawings were being used until several months after he was terminated from the project. Finally, Shaver was paid $5,000 (and, presumably, could have pursued a breach of contract claim for the remaining $5,000) for the schematics. Although the contract did not specifically cover the issue of copyright ownership, the contract was clear about the fact that Shaver was being paid for initial schematics only.
 
 
 36
 In short, neither Effects nor Shaver is factually similar to the case at hand. Most importantly, the facts in those cases amply demonstrate that the copyright owners intended that their copyrighted works be used in the manner in which they were eventually used. There is no such demonstration of intent in this case. Without intent, there can be no implied license.
 
 
 37
 For these reasons, the district court was correct to find that there was no implied non-exclusive license.
 
 B. Lanham Act Violation
 
 38
 Next, Tosch argues that the district court erred in finding him guilty of false designation of origin in violation of the Lanham Act, 15 U.S.C. § 1125(a). The Lanham Act covers trademark infringement as well as a host of other deceptive practices that might loosely be termed "unfair competition." One such form of unfair competition is the false designation of origin. The Lanham Act imposes liability on "[a]ny person who, on or in connection with any goods or services ... uses in commerce ... any false designation of origin, false or misleading description of fact, or false or misleading representation of fact, which ... is likely to cause confusion, or to cause mistake, or to deceive ... as to the origin ... of his or her goods, services, or commercial activities." 15 U.S.C. § 1125(a)(1)(A).
 
 
 39
 A Lanham Act claim for false designation of origin must contain two elements: (1) the false designation must have a substantial economic effect on interstate commerce; and (2) the false designation must create a likelihood of confusion. Lyon v. Quality Courts United, Inc., 249 F.2d 790, 795 (6th Cir.1957). Another court has described the necessary elements of a false designation claim as "an effect on interstate commerce, and a false designation of origin or false description or representation of the goods or services." Consumers Union of the United States v. New Regina Corp., 664 F.Supp. 753, 764 n. 12 (S.D.N.Y.1997). A description of origin will be considered false if it creates a likelihood of confusion in the consuming public. Id.
 
 
 40
 Tosch argues that Johnson failed to satisfy the interstate commerce element, because the Jones house is located in Michigan. The house is bought and sold only in Michigan, the argument continues, and, therefore, a false designation as to the designing architect cannot affect interstate commerce. We disagree. Tosch fundamentally misperceives the nature of this case, because he fails to grasp that the house is only part of the "goods or services" at issue in this case. For the purposes of this inquiry, Johnson's and Tosch's services as architects are the more relevant "goods or services." Johnson is licensed as an architect in Michigan, Maryland, and Arizona, and the record establishes that he has worked in all three states. The record further shows that Tosch distributed Johnson's drawings, under Tosch's own name, to the city, to the contractors on the job site, and, most notably, to a large number of subcontractors for bidding on the $1.86 million Jones house project. To the extent that this false designation hinders Johnson's ability to conduct his interstate architecture business, it affects interstate commerce.
 
 
 41
 Although the jurisdictional interstate commerce element is necessary, " 'likelihood of confusion is the essence of an unfair competition claim.' " Champions Golf Club, Inc. v. The Champions Golf Club, Inc., 78 F.3d 1111, 1123 (6th Cir.1996) (quoting Wynn Oil Co. v. American Way Service Corp., 943 F.2d 595, 604 (6th Cir.1991).) Under the more common variety of Lanham Act claim, the plaintiff asserts that the defendant is using a mark (e.g., trademark, service mark, etc.) so similar to the plaintiff's mark that the public is likely to confuse defendant's product for that of plaintiff. By this act of deception, the infringing defendant can benefit from the plaintiff's goodwill without having to pay for it; in effect, the defendant steals the plaintiff's customers.
 
 
 42
 In such cases, this Circuit has announced a set of eight factors to be considered in assessing the likelihood of confusion, including: (1) the strength of plaintiff's mark (i.e., how well-known and distinctive it is); (2) the relatedness of the services or goods offered by plaintiff and defendant; (3) the similarity between the marks; (4) evidence of actual confusion; (5) marketing channels used by plaintiff and defendant (for example, do they advertise their products in the same way?); (6) likely degree of purchaser care and sophistication; (7) intent of defendant in selecting the mark; and (8) likelihood of expansion of the product lines using the marks. Homeowners Group, Inc. v. Home Marketing Specialists, Inc., 931 F.2d 1100, 1106 (6th Cir.1991) (citing Frisch's Restaurant, Inc. v. Shoney's, Inc., 759 F.2d 1261, 1264 (6th Cir.1985) and Frisch's Restaurants, Inc. v. Elby's Big Boy, Inc., 670 F.2d 642 (6th Cir.), cert. denied, 459 U.S. 916, 103 S.Ct. 231, 74 L.Ed.2d 182 (1982)). As this Court has noted, "the eight factors are not an end in themselves, and are not all of equal significance." Champions Golf Club, 78 F.3d at 1122. Furthermore, "[t]hey imply no mathematical precision, and a plaintiff need not show that all, or even most, of the factors listed are present in any particular case to be successful." Id. at 1116 (quoting Wynn Oil Co. v. Thomas, 839 F.2d 1183, 1186 (6th Cir.1988)).
 
 
 43
 The present case is slightly different from the run-of-the-mill Lanham Act case, and, as it happens, much simpler. Here, the defendant has not produced a product to which he has applied a mark so like the plaintiff's that the public is likely to believe that the product was produced by the plaintiff. Rather, the defendant has taken the plaintiff's product and has represented it to be his own work. It is difficult to imagine how a designation of origin of a product could be more false, or could be more likely to cause confusion or mistake as to the actual origin of the product. We need not inquire about the distinctiveness or secondary meaning of the trademarks involved, because the trademarks are not the issue. In fact, most of the eight Frisch factors are irrelevant to this inquiry because they deal with the relationship between the plaintiff's and defendant's trademarks, not their products. There is no question that Johnson and Tosch provide the same kinds of services, or that they use similar marketing channels. That Johnson and Tosch compete against each other in the market for architectural services is evidenced most amply by the fact that Johnson lost Jones' business to Tosch.
 
 
 44
 Furthermore, it is obvious beyond dispute that by taking Johnson's name and seal off of the plans and replacing them with his own, Tosch intended for people to assume that the plans were his, and not Johnson's. Indeed, this Court is hard-pressed to imagine what effect these actions could possibly have other than to convince anyone who looked at the plans that they were Tosch's work. Few are the cases demonstrating a more obvious and imminent likelihood of confusion.
 
 
 45
 For these reasons, the district court was correct to find Tosch liable under the Lanham Act for false designation of origin.
 
 C. Attorney's Fees Under the Lanham Act
 
 46
 Next, Tosch argues that the district court should not have imposed attorney's fees on him, because the district court improperly found his infringement to be "willful" or "deliberate." This Court has held that, pursuant to § 35 of the Lanham Act, 15 U.S.C. § 1117, attorney's fees may be awarded in "exceptional cases." Hindu Incense v. Meadows, 692 F.2d 1048, 1051 (6th Cir.1982). Thus, we review a district court's decision to award attorney's fees under the Lanham Act in the same way as its decision to award attorney's fees under any discretionary provision; i.e., for an abuse of discretion. See, e.g., Wynn Oil Co. v. American Way Serv. Corp., 943 F.2d 595, 607 (6th Cir.1991). A case should be considered "exceptional" only when the infringement is "malicious, fraudulent, willful, or deliberate." Hindu Incense, 692 F.2d at 1051. Tosch quotes ALPO Petfoods, Inc. v. Ralston Purina Co., for the proposition that "willful" or bad faith infringement, so as to justify an award of attorney's fees, "usually means passing off a product or service as another seller's better established one, or some other deliberate theft of a marketholder's goodwill." 913 F.2d 958, 964 (Fed.Cir.1990). We could not agree more.
 
 
 47
 As discussed above, there is no doubt that Tosch wished to pass Johnson's work off as his own. In doing so, Tosch gained a veritable cornucopia of benefits. The design was obviously a good one, or neither Tosch nor Jones would have wanted to use it. Tosch spent no time creating the design, but he earned gross revenues of $16,560 by using it. In addition, submitting Johnson's design to the city for approval saved valuable time, because the plans, having already been approved when they bore Johnson's name, were approved the same day they were submitted. This benefit should not be underestimated, as the record clearly shows that time was of the essence to Jones in the completion of her dream home. Moreover, Tosch received the benefit of countless subcontractors' seeing Johnson's excellent work and thinking that it was actually the work of Tosch. Indeed, any potential home-buyer who liked Jones' house would, upon searching the city's public records, be led to believe that Tosch, and not Johnson, was the architect who designed the home.
 
 
 48
 As noted above, the typical case of deliberate "passing off" involves a defendant's passing off his own product as that of the plaintiff. This, however, is the quintessential "reverse passing off"; here, the defendant is deliberately passing off the plaintiff's product as his own. If anything, this variety of "deliberate theft of a marketholder's goodwill" is more egregious than ordinary passing off, as it involves actual theft. This is an "exceptional case," because Tosch literally stole Johnson's plans.
 
 
 49
 In his defense, Tosch asserts that he relied on Stoepker's advice in using the drawings. He relied on the advice of counsel, he argues, and was therefore not acting in bad faith. This argument fails to pass the "smell test." Tosch has worked as an architect for 25 years. Moreover, he has his own attorney and that attorney is not Stoepker. Tosch claims that he did not seek the advice of his own attorney because his attorney had no experience in copyright matters. We find this argument troubling for a number of reasons. First, it seems odd, bordering on obtuse, for an architect to retain counsel wholly inexperienced in copyright matters, especially given the fact that every AIA contract contains provisions about copyright ownership. Second, Stoepker admitted that he, like Tosch's lawyer, had no experience in copyright. So, Tosch cannot claim that he sought the more experienced opinion of a specialist.
 
 
 50
 Third, the nature of the "advice" Tosch received from Stoepker does not suggest that it could reasonably be relied upon. Tosch admits that he knew there were copyright problems, but claims to have been assured by Uznis that Stoepker said there were no copyright problems. Tosch testified that Stoepker's advice was based on preliminary research and that Stoepker promised him a final letter of confirmation. The record contains no evidence that any such letter was ever sent. The district court concluded that Tosch's reliance on a preliminary answer and an unfulfilled promise of future confirmation from Stoepker was wholly unreasonable. We agree.
 
 
 51
 For these reasons, the district court did not abuse its discretion in finding that this was an "exceptional case" warranting the award of attorney's fees to the prevailing party.
 
 D. Johnson's Cross-Appeal
 
 52
 Johnson claims that the district court committed three errors: (1) it refused to award him attorney's fees and statutory damages pursuant to §§ 504(c) and 505 of the Copyright Act; (2) it failed to award him Tosch's gross revenue pursuant to § 504(b) of the Copyright Act; and (3) it refused to award him actual damages suffered pursuant to § 504(b) of the Copyright Act.
 
 1. Statutory Damages and Attorney's Fees
 
 53
 "Statutory damages are designed not solely to compensate the copyright owner for losses incurred, but also to deter future infringement." F.W. Woolworth Co. v. Contemporary Arts, Inc., 344 U.S. 228, 233, 73 S.Ct. 222, 97 L.Ed. 276 (1952). In cases of willful infringement, the Court is permitted to increase the award to as much as $100,000. 17 U.S.C. § 504(c)(2). In addition, § 505 provides for the award of costs and attorney's fees at the district court's discretion. 17 U.S.C. § 505. Section 412(1), however, limits the scope of these two sections by providing that "no award of statutory damages or of attorney's fees, as provided in sections 504 and 505, shall be made ... [if] infringement of copyright in an unpublished work commenced before the effective date of its registration." 17 U.S.C. § 412(1). Thus, Johnson cannot recover statutory damages or attorney's fees under the Copyright Act if Tosch's infringement "commenced" before the copyright was registered.
 
 
 54
 Ordinarily, we review for an abuse of discretion a court's decision whether to award attorney's fees. See, e.g., Wynn Oil Co., 943 F.2d at 607. Section 412(1), however, leaves no room for discretion, mandating that no attorney's fees or statutory damages be awarded so long as the infringement commenced before registration of the copyright. Johnson does not question the district court's factual findings as to the date of registration or the dates on which the infringing activity took place. Rather, he challenges the district court's legal conclusion that the facts in this case demonstrate that the copyright infringement "commenced" before the copyright was registered. We review the district court's legal conclusion de novo. Duncan v. Coffee County, Tenn., 69 F.3d 88, 92 (6th Cir.1995).
 
 
 55
 The district court correctly noted that Johnson registered his copyright on December 6, 1993. The district court also noted that the infringement of Johnson's copyright began in November, 1993-a full month before registration. Johnson counters that the district court improperly viewed the infringement as a continuing process, rather than a series of separate acts of infringement. By viewing each of Tosch's actions as a new act of infringement, Johnson is able to identify the December 22 drawings of the South Addition to the Jones house as an act of infringement that "commenced" after the registration date.
 
 
 56
 Johnson's interpretation of the word "commenced" conflicts with both the case law and the purpose of the limitations contained in § 412. Section 412(1) is designed to ensure that an infringer of an unpublished work will be subject to the punitive effects of §§ 504(c) and 505 only if the infringer had constructive notice that the work was protected by a valid copyright. Constructive notice of a valid copyright is presumed upon registration. The purposes of this design are many.
 
 
 57
 First and foremost, Congress intended that § 412 provide copyright owners with an incentive to register early and often. Under the 1909 Copyright Act, both publication and registration were compulsory for most types of works; i.e., no recovery unless the copyrighted work was both published and registered. 17 U.S.C. § 10 (1934) (repealed 1976). The 1976 Copyright Act removed those harsh limitations, thus bringing unpublished works under the umbrella of federal copyright protection and making registration optional. Congress realized, however, that "copyright registration ... is useful and important to users and the public at large ... and should therefore be induced in some practical way." H.R.Rep. No. 1476 at 158, 94th Cong., 2d Sess. (1976) U.S.Code Cong. & Admin.News 1976 at 5659, 5774. By offering the additional choice of statutory damages to those who register promptly, § 412 "induce[s] [copyright registration] in some practical way." Id.
 
 
 58
 In addition to giving copyright owners incentive to register, § 412 also provides potential infringers with an incentive to check the federal register. If § 412 succeeds in encouraging copyright owners to register and in encouraging potential infringers to check registration, then it will have reduced both the search costs imposed on potential infringers and the enforcement costs borne by copyright owners. And, finally, the simplicity of § 412 confers upon all parties involved the clarity and low administrative costs of a brightline rule.
 
 
 59
 These purposes would be thwarted by holding that infringement is "commenced" for the purposes of § 412 each time an infringer commits another in an ongoing series of infringing acts. Under § 412, statutory damages and attorney's fees are reserved for infringers who had constructive notice that the work was covered by a valid copyright. Had Tosch checked the federal register when he first began his infringing activity, he would have discovered that Johnson's copyright was not registered. If the incentive structure of § 412 is to be properly applied, then Johnson should not receive the reward of statutory damages, because he did not satisfy the requirement of prompt registration.
 
 
 60
 Every court to consider this question has come to the same conclusion; namely, that infringement "commences" for the purposes of § 412 when the first act in a series of acts constituting continuing infringement occurs. See, e.g., Ez-Tixz, Inc. v. Hit-Tix, Inc., 919 F.Supp. 728, 736 (S.D.N.Y.1996) ("The alleged acts of infringement that occurred after the copyright was registered do not constitute new acts of infringement but a continuation of the infringement that 'commenced' prior to registration."); Parfums Givenchy, Inc. v. C & C Beauty Sales, Inc., 832 F.Supp. 1378, 1393 (C.D.Cal.1993) (holding that "the first act of infringement in a series of ongoing separate infringements 'commence[s]' one continuing 'infringement' ") (brackets in original); Mason v. Montgomery Data, Inc., 741 F.Supp. 1282, 1285 (S.D.Tex.1990), rev'd on other grounds, 967 F.2d 135 (5th Cir.1992) ("A 'new' or 'separate' basis for the award of statutory damages is created, however, only where there is a difference between pre- and post-registration infringing activities."); Singh v. Famous Overseas, Inc., 680 F.Supp. 533, 535 (E.D.N.Y.1988), aff'd, 923 F.2d 845 (2d Cir.1990) (holding that infringement does not "commence" with each new act in an ongoing infringement, because "it would be peculiar if not inaccurate to use the word 'commenced' to describe a single act"); Johnson v. Univ. of Virginia, 606 F.Supp. 321, 325 (D.Va.1985) (holding that infringement does not "commence" with each new act in an ongoing infringement, because "ascribing such a meaning to the term 'commenced' would totally emasculate § 412"); Whelan Associates, Inc. v. Jaslow Dental Laboratory, Inc., 609 F.Supp. 1325, 1331 (E.D.Pa.1985), aff'd on other grounds, 797 F.2d 1222 (3d Cir.1986), cert. denied, 479 U.S. 1031, 107 S.Ct. 877, 93 L.Ed.2d 831 (1987) ("Interpreting 'commencement of infringement' as the time when the first act of infringement in a series of ongoing discrete infringements occurs ... would best promote the early registration of a copyright. It would strongly encourage prompt registration.").
 
 
 61
 For these reasons, the district court was correct to deny Johnson's request for statutory damages and attorney's fees under §§ 504(c) and 505 of the Copyright Act.
 
 2. Gross Revenue
 
 62
 The district court found Tosch liable for $2,500 in profit, because Tosch testified that he averaged 15% profit on his work. Tosch admitted to making $16,560 in gross revenue, so the district court awarded Johnson 15% of that sum. Johnson argues, however, that the district court should have awarded him the full $16,560 because Tosch failed to provide any evidence of deductible expenses. Johnson argues that once he met the burden of establishing Tosch's gross revenue, the burden then shifted to Tosch to prove any expenses to deduct from that amount. We agree.
 
 
 63
 Section 504(b) of the Copyright Act specifically provides that "in establishing the infringer's profits, the copyright owner is required to present proof only of the infringer's gross revenue, and then the infringer is required to prove his or her deductible expenses." 17 U.S.C. § 504(b). The statute is clear and unambiguous. So, too, is the record in this case. Tosch provided no evidence of his deductible expenses. Rather, he testified to what his average margin of profit had been for the 40 or 50 jobs he had undertaken in 1994.
 
 
 64
 In addition to controverting the plain and unambiguous language of the statute, awarding only Tosch's average margin of profit flies in the face of common sense. It is axiomatic that an architect who steals another architect's drawings and uses them as his own will not incur the same expenses that he would if he were forced to start from scratch. Here, Tosch was able to cut considerable costs, in terms of both effort and expensive delays, by presenting Johnson's efforts as his own. Very often, the act of infringement allows the infringer to pocket as net profit a much larger percentage of his gross revenue than he could have absent the infringement. It is for precisely this reason that the Copyright Act shifts the burden of proving deductible expenses to the defendant after the plaintiff has proven gross revenue.
 
 
 65
 Thus, the district court erred in awarding Johnson only $2,500 as a result of Tosch's infringement. Instead, the district court should have awarded Johnson $16,560, because he met his burden of proving Tosch's gross revenue.
 
 3. Actual Damages in Addition to Profits
 
 66
 Finally, Johnson claims that he should have been awarded actual damages, in addition to Tosch's profits. Johnson claims that, if not for Tosch's infringement, he would have earned $35,025.68 ($1.86 million X his normal 3.5% architectural fee, less the $29,966.86 paid by Jones) for his work as an architect, and $259,970.62 ($1.55 million X 14% builder's fee) for his work as a builder on the Jones house. According to Johnson, therefore, he suffered actual damages in the amount of $294,996.30.
 
 
 67
 The district court, however, found Johnson's claims to be "wholly speculative." There is no evidence that Johnson was fired because of Tosch's infringement. To the contrary, the record shows that Johnson was terminated because he and Jones were unable to agree on a contract. Tosch did not copy Johnson's drawings until after Johnson had been terminated, which suggests that the infringement had nothing to do with Johnson's termination by Jones. Johnson argues that Jones would not have terminated him if Tosch and Uznis had not been available, but there is no evidence in the record to support this conclusion, and, in any event, their availability was not dependent on the infringement.
 
 
 68
 The district court was therefore correct to hold that Johnson's actual damages claims were "wholly speculative."
 
 III. CONCLUSION
 
 69
 For the reasons stated above, we AFFIRM the judgment of district court in all respects, except for its denial of an award to Johnson in the amount of Tosch's gross revenue. We REVERSE that aspect of the judgment and REMAND with instructions to the district court to award damages to Johnson under § 504(b) in the amount of Tosch's gross revenue.
 
 
 
 *
 The Honorable Jerome Farris, Circuit Judge of the United States Court of Appeals for the Ninth Circuit, sitting by designation