**VAN BROUCK & ASSOCIATES, INC., Plaintiff,**

v.

**DARMIK, INC., and Dario Tomei, Defendants.**

**No. CIV. 01–40319.**

United States District Court, E.D. Michigan, Southern Division.

Aug. 4, 2004.

Robert L. Baker, Robert L. Baker Assoc., Plymouth, MI, for Van Brouck and Associates, Incorporated, Plaintiff.

Mark A. Cantor, Brooks & Kushman (Southfield), Southfield, MI, Richard Soranno, New Boston, MI, Seth E. Rodack, Brooks & Kushman (Southfield), Southfield, MI, for Darmik, Inc., Dario Tomei, Defendants.

### FINDINGS OF FACT AND CONCLUSIONS OF LAW

GADOLA, District Judge.

## I. INTRODUCTION

On October 23, 2003, Defendants admitted liability in this copyright infringement action concerning an architectural work. *See* 17 U.S.C. § 101. In December 2003, the Court conducted a bench trial solely on the issue of damages: specifically, Plain-

tiff's actual damages as well as Defendants' (i.e., the infringers') profits attributable to the infringement. *See* 17 U.S.C. §§ 504(a)(1), 504(b). The parties presented evidence on December 15, 16, and 19, 2003, and the Court heard closing arguments on December 23, 2003.

The Court now issues its findings of fact and conclusions of law pursuant to Rule 52 of the Federal Rules of Civil Procedure. These findings of fact and conclusions of law represent the Court's consideration of all of the evidence in light of the pertinent law, the Court's observation of the witnesses, and its evaluation of their demeanor, qualifications, and credibility. *See Seal–Flex, Inc. v. W.R. Dougherty & Assocs., Inc.,* 254 F.Supp.2d 647, 649 (E.D.Mich.2003) (Gadola, J.). Every finding of fact that may be construed to incorporate a conclusion of law is hereby adopted as a conclusion of law. *See id.* Every conclusion of law that may be construed to incorporate a finding of fact is hereby adopted as a finding of fact. *See id.* The subheadings used herein are for convenience only. *See id.* If a finding of fact or conclusion of law is pertinent to any determination other than that indicated by the heading under which it appears, it is deemed adopted as a finding of fact or conclusion of law applicable to such other determination or determinations as may be appropriate. *See id.*

## II. FINDINGS OF FACT

### A. Parties

1. Plaintiff is in the business of creating customized architectural plans for residential properties. Tr. at 58–59.

2. Plaintiff's principal is John Van Brouck. Tr. at 58.

3. Defendant Darmik, Inc., is a corporation that was created for the purpose of developing the Whispering Pines Subdivision in Livonia, Michigan. Tr. at 247, 319–20.

4. Defendant Darmik's principal is Defendant Dario Tomei. Tr. at 247.

### B. Background

5. In the period spanning from 1997 to 1998, Plaintiff created architectural plans for a single-family house known as the "Rana Residence" for a family known as the Rana family. Tr. at 91.

6. The Rana Residence is located in Riverview, Michigan. Tr. at 79.

7. Plaintiff's plans for the Rana Residence (hereinafter "the Rana Plans") are architectural works as defined by 17 U.S.C. § 101. Jt. Final Pretrial Order (Dec. 3, 2003) at ¶ 4.B.

8. During the construction of the Rana Residence, the Rana Plans were shared with an entity known as Erb Lumber. Tr. at 98, 101, 127.

9. Thereafter, Defendants' agent, Michael Garavaglia, visited Erb Lumber, which informally retains architectural plans from past projects in which it was involved. Tr. at 127.

10. Mr. Garavaglia visited Erb Lumber to review numerous architectural plans for houses on behalf of Defendant Tomei, who was looking to build a house for himself on one of the lots in the Whispering Pines Subdivision. Tr. at 126–27.

11. Mr. Garavaglia obtained, free of charge, between four and six sets of plans from Erb Lumber, and he gave these plans to Defendant Tomei. Tr. at 127–28.

12. The Rana Plans were among the plans given to Defendant Tomei. Tr. at 128.

13. After reviewing the plans, Defendant Tomei selected the Rana Plans for his house in the Whispering Pines Subdivision. Tr. at 129.

14. Mr. Garavaglia, on behalf of Defendants, then contacted Plaintiff, whose contact information appeared on the Rana Plans. Tr. at 129–30.

15. Mr. Garavaglia had two telephone conversations with Mr. Van Brouck in early 1999. Tr. at 81, 112, 131, 134, 136.

16. In those two telephone conversations, Mr. Garavaglia attempted to purchase the rights to the Rana Plans for a few thousand dollars in order to build Defendant Tomei's desired house. Tr. at 82–83, 102, 109–10, 130.

17. Because the Rana Plans were customized plans created for one exclusive house, Mr. Van Brouck declined—as is his customary practice in such situations—to resell the Rana Plans to Mr. Garavaglia and Defendants. Tr. at 82–83, 102, 109–10.

18. Thus, as the parties have stipulated, Plaintiff never permitted, expressly or impliedly, Defendants to copy, borrow from, modify, or in any way use the Rana Plans. Jt. Final Pretrial Order at ¶ 4.E; see also Tr. at 82–83, 102, 109–10.

19. Instead, Mr. Van Brouck offered to create new customized plans for Defendant Tomei's desired house—as is his customary practice in such situations—but Defendants were not interested in this offer. Tr. at 82–83, 102, 109–10.

20. Thereafter, without further contact with Plaintiff, Defendants used the Rana Plans to build a house for Defendant Tomei in the Whispering Pines Subdivision (hereinafter "the Tomei Residence"). Jt. Final Pretrial Order at ¶ 4.F.

21. Defendants have never paid Plaintiff for their use of the Rana Plans. Jt. Final Pretrial Order at ¶ 4.D.

22. Construction on the Tomei Residence began in 1999, and it was completed in approximately July 2001. Tr. at 104, 143, 188.

23. There are twenty-two lots in the Whispering Pines Subdivision, and Defendants built the Tomei Residence on Lot 14. Pl.Ex. 11; Tr. at 124, 191, 313–14.

24. The Tomei Residence is a two-story house with a fully-finished basement; the total living space, including the basement, is 6,238 square feet. Tr. at 19–21.

25. Once the Tomei Residence was completed, Defendant Tomei elected not to occupy the house, and, therefore, Defendants placed the Tomei Residence on the market for sale. Tr. 266, 269–72.

26. In July 2001, while driving through Livonia, Mr. Van Brouck noticed a new subdivision, which happened to be the Whispering Pines Subdivision. Tr. at 103–04.

27. As is his practice, due to the nature of his business, Mr. Van Brouck turned into the subdivision to review the activity in the subdivision. Tr. at 103.

28. Mr. Van Brouck then saw the Tomei Residence and noted that it looked familiar to him. Tr. at 103.

29. As the Tomei Residence was for sale, Mr. Van Brouck was able to enter and look inside the house, at which point he determined that the Tomei Residence was nearly-identical to the Rana Residence. Tr. at 103–05.

30. Mr. Van Brouck's assessment was correct: but for minor variations, the Tomei Residence is identical to the Rana Residence, and the reason for the strong resemblance was the fact that, as indicated above, Defendants used the Rana Plans to build the Tomei Residence. Tr. at 189.

31. Shortly thereafter, in July 2001, Mr. Van Brouck, on behalf of Plaintiff, engaged counsel in regards to this matter, at which point counsel sent a letter to

928

Defendants notifying them of Plaintiff's copyright infringement allegations against them. Tr. at 106–07, 282.

32. On August 27, 2001, Plaintiff registered its copyright in the Rana Plans with the United States Copyright Office (Copyright Registration No. VA1–090–873). Tr. at 103.

33. On November 15, 2001, Plaintiff filed the complaint in this action alleging copyright infringement.[1]

34. On November 20, 2001, summonses were executed and the complaint was served with respect to each Defendant.

35. On December 6, 2001, Defendant Darmik issued a quit claim deed for the Tomei Residence to Defendant Tomei's son, Dino Tomei, for one dollar. Pl.Ex. 11; Tr. at 326.

36. According to Defendant Tomei, the quit claim deed was issued (and thus the property transferred) for homestead purposes (i.e., for tax purposes); according to Defendant Tomei, despite the quit claim deed, his son is not the true owner of the Tomei Residence; pursuant to Defendant Tomei's testimony, Defendants remain the "economic owners" (for lack of a better term) of the Tomei Residence because, if the house was sold, Defendants would receive the proceeds of the sale. Tr. at 325–27, 352–54.

37. Although the Tomei Residence was at least tacitly for sale as early as July 2001, it was not officially listed by a real estate agent until February 20, 2002. Pl. Ex. 10; Tr. at 28, 359.

38. Although there were some twenty-five showings of the house to prospective buyers, Defendants were unable to sell the house, and, on March 2, 2003, Defendants

took the Tomei Residence off the market; it is no longer for sale. Pl.Ex. 10; Tr. at 28, 268, 328, 359, 370.

39. Defendant Tomei's son currently lives in the Tomei Residence. Tr. at 123, 328.

## C. Value of the Plans (Actual Damages)

40. In 1997 and 1998, when Plaintiff created the Rana Plans, Plaintiff charged $3.00 per square foot for its customized architectural plans. Tr. at 69–70, 84.

41. As the Rana Residence was the same size as the Tomei Residence, i.e., 6,238 square feet of total living space, the Rana Plans were worth $18,714.00 in 1997 and 1998 (6,238 square feet by $3.00 per square foot equals $18,714.00). Tr. at 19–21, 70, 84.

42. Nevertheless, after the Rana family and Plaintiff engaged in price/discount negotiations, Plaintiff charged the Rana family $15,000.00 for the Rana Plans. Tr. at 69–71.

43. As Plaintiff is in the business of designing unique, one-of-a-kind architectural plans, Plaintiff does not resell and has never resold any of its customized architectural plans; consequently, the best measure of the value of the plans used to build the Tomei Residence is the amount Plaintiff would have charged Defendants for new customized plans for the same size house. Tr. 81, 83–84.

44. At the time Defendants attempted, via Mr. Garavaglia, to purchase the rights to use the Rana Plans to build the Tomei Residence and at the time Defendants used the Rana Plans to build the Tomei

1. The complaint also included two state law claims, quantum meruit and conversion. On November 27, 2001, the Court declined to exercise supplemental jurisdiction over these state law claims and dismissed them without prejudice. *See United Mine Workers v. Gibbs,* 383 U.S. 715, 726, 86 S.Ct. 1130, 16 L.Ed.2d 218 (1966); 28 U.S.C. § 1367(c)(2).

Residence in 1999, Plaintiff's rate for designing customized architectural plans was $4.00 per square foot. Tr. 83, 130, 134, 143.

45. This $4.00 rate comports with the going rate among designers of customized architectural plans in the relevant marketplace and during the relevant period, as attested to by Mr. Van Brouck (who was qualified by the Court as an expert on the value of customized architectural plans and who testified that average rates for designing customized architectural plans range from $3.00 to $6.00 per square foot) and as confirmed by Mr. Garavaglia (who testified that, in his personal experience, $3.00 to $4.00 is the going rate for customized architectural plans). Tr. 85–87, 201–02.

■ 46. Accordingly, the Court finds by a preponderance of the evidence that the fair market value of the plans used by Defendants to build the Tomei Residence, as measured by the amount Plaintiff would have charged Defendants for new customized architectural plans, is **$24,952.00** (6,238 square feet by $4.00 per square foot equals $24,952.00). Tr. 19–21, 70, 81, 83–84, 87.

47. The fact that Plaintiff, after negotiations, gave a discount to the Rana family for the Rana Plans does not require an equivalent discounting of the $24,952.00 amount in this case because Defendants' actions precluded an opportunity to negotiate a discount on customized architectural plans for the Tomei Residence; thus, the appropriate value of the plans used by Defendants to build the Tomei Residence should not include a departure or discount from the $4.00 rate. Jt. Final Pretrial Order at ¶¶ 4.D–F; Tr. at 69–71, 82–83, 102, 109–10.

■ 48. Furthermore, although Defendants conceded that they never purchased the Rana plans from Plaintiff, Defendants offered testimony from Mr. Garavaglia that he and Mr. Van Brouck negotiated a price for the use of the Rana plans in the $1,500.00 to $2,500.00 range; the aforementioned $24,952.00 amount is unaffected by this testimony because the Court finds that Mr. Garavaglia's testimony in this regard is inaccurate and incredible. Jt. Final Pretrial Order at ¶¶ 4.D–E; Tr. 82–83, 102, 109–10, 130–39, 199–202.[2]

### D. Value of Tomei Residence (Infringer's Profits)

49. On February 20, 2002, Defendants initially listed the Tomei Residence, including the land upon which it is built, at a price of $839,000.00. Pl.Ex. 10; Tr. at 28, 42, 204–05, 266–67, 359–60.

50. On June 6, 2002, Defendants reduced the asking price for the Tomei Residence to $799,900.00. Pl.Ex. 10; Tr. at 29, 42.

51. On August 29, 2002, Defendants reduced the asking price for the Tomei Residence to $779,900.00. Pl.Ex. 10; Tr. at 29, 43, 204–05, 267, 360.

52. On November 26, 2002, because certain improvements to the house had been made (e.g., landscaping and a deck), Defendants increased the asking price for the Tomei Residence to $799,000.00. Pl. Ex. 10; Tr. at 43–44, 204–05, 210–11, 227, 268, 360, 367–68.

53. The Tomei Residence did not sell at any of these prices, and, on March 2, 2003, as indicated above, Defendants took the Tomei Residence off the market; it

---

**2.** Further, the Court notes that "while the copyright owner can sell or license his rights to someone else, section 204 of the Copyright Act invalidates a purported transfer of ownership unless it is in writing." *Johnson v. Jones,* 149 F.3d 494, 500 (6th Cir.1998) (citing 17 U.S.C. § 204; quoting *Effects Assocs., Inc. v. Cohen,* 908 F.2d 555, 556 (9th Cir.1990)).

has not been on the market since that time. Pl.Ex. 10; Tr. at 28, 204–05, 328–29.

54. While the Tomei Residence was on the market (i.e., between February 20, 2002, and March 2, 2003), two oral offers to purchase the Tomei Residence were made to Defendants' real estate agent, Karen Camilleri. Tr. at 360–66, 371–74; Def. Tomei Dep. (Nov. 22, 2002) at 31–32; Fed.R.Evid. 801(d).

55. One of the offers on the Tomei Residence was for approximately $650,000.00, and the other offer was for $700,000.00. Tr. at 334, 361–66, 371–74; Def. Tomei Dep. (Nov. 22, 2002) at 31–32; Fed.R.Evid. 801(d).

56. Ms. Camilleri presented both offers to Defendants and/or their agent, Mr. Garavaglia, and both offers were rejected. Tr. at 334, 361–66, 371–74; Def. Tomei Dep. (Nov. 22, 2002) at 31–32; Fed.R.Evid. 801(d).

■ 57. Consequently, the Court finds that the fair market value of the Tomei Residence, including the land upon which it is built, lies somewhere between $700,000.00 (the highest offer) and the $779,000.00 (the lowest asking price). Pl. Ex. 10; Tr. at 29, 43, 204–05, 267, 334, 360–66, 371–74; Def. Tomei Dep. (Nov. 22, 2002) at 31–32; Fed.R.Evid. 801(d).

58. Within this range, several estimates of the value of the Tomei Residence were presented at trial; the most reliable method of establishing the value in this situation is the state-equalized-value (hereinafter "SEV") approach. Tr. 18–20, 228, 236.

59. Under the SEV approach, according to Plaintiff's real estate expert, Craig Lescoe, and Defendants' real estate expert, James Jones, the value of a given property is established by taking the SEV—which is a municipality's assessment of the property for property tax pur-

poses—and multiplying that SEV amount by two. Tr. 18–20, 228, 236.

60. Here, the SEV of the Tomei Residence for 2003 was $355,950.00. Tr. 19–20, 236.

61. Accordingly, the Court finds by a preponderance of the evidence that the fair market value of the Tomei Residence, including the land upon which it is built, is $711,900.00, as established by the aforementioned SEV approached (the SEV, $355,950.00, multiplied by two equals $711,900.00). Tr. 19–20, 236.

### E. Deductible Expenses for Tomei Residence (Infringer's Profits)

■ 62. The only documentation of Defendants' expenses submitted or testified to with regard to the Tomei Residence are those set forth in an informal summary labeled "list of expenses" (Defendants' Exhibit 2A), which is accompanied by group of supporting invoices and cancelled checks (Defendants' Exhibit 2). Def. Ex. 2A; Def. Ex. 2 Pl.Ex. 6; Tr. at 175–76, 180–81.

63. Defendants' list of expenses for the Tomei Residence claims a total amount of $786,200.45 as deductible expenses. Def. Ex. 2A; Tr. at 181, 184.

64. However, as will be detailed below, Defendants' list of expenses is rife with inconsistencies, errors, and unsubstantiated claims, and, as a result, the claimed amount of $786,200.45 is not entirely accurate. Tr. at 349–50; *see also infra.*

65. Therefore, while Defendants' claimed amount of $786,200.45 is a sufficient starting point for determining Defendants' deductible expenses (as Plaintiff concedes in its trial materials), the errors and unsubstantiated claims must be purged from the list and the corresponding amounts must be subtracted from the $786,200.45 amount in order to arrive at the correct amount of deductible expenses

for the Tomei Residence. Def. Ex. 2A; Tr. at 181, 184; Pl. Supp. Proposed Findings of Fact & Conclusions of Law; *see also infra.*

### E–1. Stipulation: Error on Defendants' List of Expenses

66. An amount of $21,500.00 to Blue Collar Enterprises must be subtracted; the parties stipulated that this amount of $21,500.00 for woodworking expenses was erroneously included in the list of expenses. Def. Ex. 2A at 1; Tr. at 278–80.

67. Thus, after this subtraction, the amount of deductible expenses becomes $764,700.45 ($786,200.45 less $21,500.00 equals $764,700.45).

### E–2. Discrepancies between Defendants' List of Expenses and Supporting Documentation

68. An amount of $840.00 to Ambit Land Surveyors must be subtracted; the list of expenses states that $1,200.00 was paid to Ambit Land Surveyors for surveying and staking, but the two supporting invoices dated December 9, 1999, and November 27, 2000, from Ambit Land Surveyors only reveal payments of $160.00 and $200.00 ($1,200.00 less $160.00 less $200.00 equals $840.00). Def. Ex. 2A at 1; Def. Ex. 2; Pl.Ex. 6 at 15, 207; Tr. at 317.

69. After this subtraction, the amount of deductible expenses becomes $763,860.45 ($764,700.45 less $840.00 equals $763,860.45).

70. An amount of $271.00 to Canton Waste Recycling must be subtracted; the list of expenses states that $1,643.00 was paid on an invoice dated December 1, 2000, to Canton Waste Recycling, but the handwriting on the invoice as well as the notations on the corresponding check (No.1955) indicate that $271.00 of the $1,643.00 was for waste removal expenses attributable to Lot 20 of the Whispering Pines Subdivi-

sion and the remainder was for waste removal expenses attributable to Lot 14, which is the lot number of the Tomei Residence. Def. Ex. 2A at 1; Def. Ex. 2; Pl.Ex. 6 at 126; Tr. at 329–30.

71. After this subtraction, the amount of deductible expenses becomes $763,589.45 ($763,860.45 less $271.00 equals $763,589.45).

72. Similarly, an amount of $174.75 to Canton Waste Recycling must be subtracted; the list of expenses states that $349.50 was paid on an invoice dated December 15, 2000, to Canton Waste Recycling; however, the notations on the corresponding check (No.1988) indicate that this $349.50 was for waste removal expenses attributable to Lot 14 as well as Lot 20, and the Court finds that $174.75 (one half of $349.50) is attributable to Lot 20 with the remainder attributable to Lot 14. Def. Ex. 2A at 1; Def. Ex. 2; Pl.Ex. 6 at 121; Tr. at 329–30; *cf.* Pl.Ex. 6 at 144.

73. After this subtraction, the amount of deductible expenses becomes $763,414.70 ($763,589.45 less $174.75 equals $763,414.70).

74. An amount of $419.25 to Canton Waste Recycling must be subtracted; the list of expenses states that $419.25 was paid on an invoice dated June 15, 2001, to Canton Waste Recycling, but the invoice states that a dumpster was picked up from Lot 14 and dropped off at Lot 22 of the Whispering Pines Subdivision; accordingly, the Court finds that this expense was for the benefit of Lot 22 and is not a deductible expense for Lot 14. Def. Ex. 2A at 1; Def. Ex. 2; Pl.Ex. 6 at 22.

75. After this subtraction, the amount of deductible expenses becomes $762,995.45 ($763,414.70 less $419.25 equals $762,995.45).

76. An amount of $142.38 to Canton Waste Recycling must be subtracted; the list of expenses states that $284.75 was paid on an invoice dated September 15, 2001, to Canton Waste Recycling, but the handwriting on the invoice indicates that $142.38 of the $284.75 was for waste removal expenses attributable to Lot 22 and the remainder to Lot 14. Def. Ex. 2A at 1; Def. Ex. 2; Pl.Ex. 6 at 144.

77. After this subtraction, the amount of deductible expenses becomes $762,853.07 ($762,995.45 less $142.38 equals $762,853.07).

78. An amount of $4,319.00 to Erb Lumber must be subtracted; the list of expenses states that $43,194.99 was paid on a statement dated February 29, 2000, to Erb Lumber for lumber, but this statement indicates that Defendants received a discount of $4,319.00 and only paid $38,875.99 for the lumber in question. Def. Ex. 2A at 2; Def. Ex. 2; Pl.Ex. 6 at 93–100; Tr. at 316–17.

79. After this subtraction, the amount of deductible expenses becomes $758,534.07 ($762,853.07 less $4,319.00 equals $758,534.07).

80. An amount of $778.97 to Erb Lumber must be subtracted; initially, Defendants' list of expenses stated that $3,612.32 was paid to Erb Lumber on December 27, 2000, but, on the list of expenses admitted into evidence, Defendants crossed out this figure and replaced it with a corrected figure of $2,833.35; however, Defendants failed to account for this correction in their total at the end of their list of expenses ($3,612.32 less $2,833.35 equals $778.97). Def. Ex. 2A at 2, 4.

81. After this subtraction, the amount of deductible expenses becomes $757,755.10 ($758,534.07 less $778.97 equals $757,755.10).

82. An amount of $80.56 to National Block Company must be subtracted; the list of expenses states that $80.56 was paid on an invoice dated June 28, 2000, to National Block Company for steps, but the invoice indicates that this $80.56 was for expenses attributable to Lots 15 and 21 of the Whispering Pines Subdivision and not Lot 14. Def. Ex. 2A at 3; Def. Ex. 2; Pl.Ex. 6 at 199.

83. After this subtraction, the amount of deductible expenses becomes $757,674.54 ($757,755.10 less $80.56 equals $757,674.54).

84. An amount of $690.00 to Sundown Security must be subtracted; initially, Defendants' list of expenses stated that $2,000.00 was paid on an invoice dated September 17, 2001, to Sundown Security for a protection system, but, on the list of expenses admitted into evidence, Defendants crossed out this figure and replaced it with a corrected figure of $1,310.00; however, Defendants failed to account for this correction in their total at the end of their list of expenses ($2,000.00 less $1,310.00 equals $690.00). Def. Ex. 2A at 4; Def. Ex. 2; Pl.Ex. 6 at 128; Tr. at 331–32.

85. After this subtraction, the amount of deductible expenses becomes $756,984.54 ($757,674.54 less $690.00 equals $756,984.54).

86. An amount of $5,200.00 to Marine City Ceiling and Partitions must be subtracted; the list of expenses states that $9,180.00 was paid on an invoice dated August 2, 2000, to Marine City Ceiling and Partitions for drywall expenses, but the handwriting on the invoice as well as the notations on the corresponding check (No. 1796) indicate that only $3,980.00 of the $9,180.00 was paid ($9,180.00 less $3,980.00 equals $5,200.00). Def. Ex. 2A at 2; Def. Ex. 2; Pl.Ex. 6 at 8; Tr. at 332–33.

87. After this subtraction, the amount of deductible expenses becomes $751,784.54 ($756,984.54 less $5,200.00 equals $751,784.54).

88. Further, Plaintiff claims that $4,350.00 to BT Contracting should be subtracted because of a purported discrepancy on an invoice dated February 16, 2000; however, the Court finds that $34,800.00, the amount included on Defendants' list of expenses, is the correct amount because the corresponding checks (Nos.1529, 1536, 1546, 1591, 1611, 1665) show that $34,800.00 was paid to BT Contracting for carpentry. Def. Ex. 2A at 1; Def. Ex. 2; Pl.Ex. 6 at 221; Tr. at 330–31.

89. Plaintiff also claims that $1,705.00 to Specialty Floor Covering should be subtracted because of a purported discrepancy on an invoice dated June 21, 2001; however, the Court finds that $3,410.00, the amount included on Defendants' list of expenses, is the correct amount because the corresponding check (No. 2188) shows that $3,410.00 was paid to Specialty Floor Covering for an oak kitchen floor. Def. Ex. 2A at 4; Def. Ex. 2; Pl.Ex. 6 at 24.

### E-3. Defendants' Claimed Expenses without Documentation or without Full Documentation

90. A sum of $17,100.00 must be subtracted; despite Defendant Tomei and Mr. Garavaglia's extensive business experience and despite the fact that Defendants had more than two years to come forward with appropriate documentation, Defendants have failed to provide any written documentation to support nine claimed expenses (some of which Defendants concede were paid in cash without receipts); while the Court is not required to be a pig hunting for truffles buried in exhibits,[3] the Court, nevertheless, closely reviewed the voluminous number of invoices, receipts, and checks submitted by Defendants via their Exhibit 2 but was unable to locate any written support for the following nine expenses claimed on Defendants' list of expenses: (1) $2,600.00 to BT Contracting for carpentry, (2) $5,500.00 to an unknown entity for "misc. labor/punch out," (3) $1,000.00 to Portelli Cleaning for "final cleaning," (4) $4,000.00 to an unknown entity for basement carpet, (5) $600.00 to an unknown entity for "touch up drywall," (6) $1,200.00 to an unknown entity for "touch up painting," (7) $300.00 to an unknown entity for "re-clean[ing]," (8) $400.00 to an unknown entity for "touch up caulking," (9) $1,500.00 to an unknown entity for "misc. punchout;" furthermore, there was insufficient testimony or, in some cases, no testimony to provide the Court with an adequate basis to find that these nine expenses were paid, that their claimed amounts are accurate, and/or that these expenses are attributable to Lot 14; accordingly, for all of these reasons, the Court finds that these nine alleged expenses are not a deductible expense for the Tomei Residence ($2,600.00 plus $5,500.00 plus $1,000.00 plus $4,000.00 plus $600.00 plus $1,200.00 plus $300.00 plus $400.00 plus $1,500.00 equals $17,100.00). Def. Ex. 2A at 1, 3–4; Def. Ex. 2; Tr. at 184–85, 280–300, 383–84.

91. After this subtraction, the amount of deductible expenses becomes $734,684.54 ($751,784.54 less $17,100.00 equals $734,684.54).

92. An amount of $3,000.00 to Bill Kero must be subtracted; the list of expenses claims that $5,000.00 was paid to Bill Kero for installing an air conditioner and for

---

3. *In re McNamara,* 275 B.R. 832, 836 (E.D.Mich.2002) (Gadola, J.) (citing *United States v. Dunkel,* 927 F.2d 955, 956 (7th Cir. 1991)); *Thomas v. Halter,* 131 F.Supp.2d 942, 945 (E.D.Mich.2001) (Gadola, J.) (citing same).

finishing basement duct work, but Defendants have not provided any receipt, invoice, or similar written documentation to support this claimed expense; nevertheless, in the Court's aforementioned review of the voluminous documents included in Defendants' Exhibit 2, the Court did locate a check (No. 2112) for $1,000.00 to William Kero dated April 6, 2001, and a second check (No. 2117) for $1,000.00 to William Kero dated April 19, 2001; consequently, given the existence of these two checks as well as Defendant Tomei and Mr. Garavaglia's supporting testimony, the Court finds $2,000.00 to Bill Kero is a deductible expense for the Tomei Residence, but, due to the lack of written support for the remainder of the claimed $5,000.00, the Court finds that the remainder, $3,000.00, is not a deductible expense for the Tomei Residence ($5,000.00 less $2,000.00 equals $3,000.00). Def. Ex. 2A at 1; Def. Ex. 2; Tr. at 185, 283–84.

93. After this subtraction, the amount of deductible expenses becomes $731,684.54 ($734,684.54 less $3,000.00 equals $731,684.54).

94. Similarly, an amount of $3,337.50 to Ugo Pasquali must be subtracted; the list of expenses claims that $3,500.00 was paid to Ugo Pasquali for masonry, but Defendants have not provided any receipt, invoice, or similar written documentation to support this claimed expense; nevertheless, in the Court's aforementioned review of the voluminous documents included in Defendants' Exhibit 2, the Court did locate a check (No. 2283) for $325.00 to Ugo Pasquali dated October 22, 2001; the notations on this check indicate that the check was for work performed on Lot 14 as well as Lot 15 of the Whispering Pines Subdivision; consequently, given the existence of this check as well as Defendant Tomei and Mr. Garavaglia's supporting testimony, the Court finds $162.50 (one half of $325.00) to Ugo Pasquali is a deductible expense for the Tomei Residence, but, due to the lack of written support for the remainder of the claimed $3,500.00, the Court finds that the remainder, $3,337.50, is not a deductible expense for the Tomei Residence ($3,500.00 less $162.50 equals $3,337.50). Def. Ex. 2A at 4; Def. Ex. 2; Tr. at 185, 299.

95. After this subtraction, the amount of deductible expenses becomes $728,347.04 ($731,684.54 less $3,337.50 equals $728,347.04).

96. Likewise, an amount of $4,437.50 to Glover Excavating must be subtracted; the list of expenses claims that $5,500.00 was paid to Glover Excavating for "water/sewer/sump line backfill and final grade," but Defendants have not provided any receipt, invoice, or similar written documentation to support this claimed expense; nevertheless, in the Court's aforementioned review of the voluminous documents included in Defendants' Exhibit 2, the Court did locate a check (No. 1872) for $8,500.00 to Glover Excavating dated October 5, 2000; the notations on this check indicate that the check was for work performed on Lot 14 as well as seven other lots (Lots 5, 6, 12, 15, 19, 20, and 21) of the Whispering Pines Subdivision; consequently, given the existence of this check, the Court finds $1,062.50 (one eighth of $8,500.00) to Glover Excavating is a deductible expense for the Tomei Residence, but, due to the lack of written support for the remainder of the claimed $5,500.00, the Court finds that the remainder, $4,437.50, is not a deductible expense for the Tomei Residence ($5,500.00 less $1,062.50 equals $4,437.50). Def. Ex. 2A at 2; Def. Ex. 2; Tr. at 332.

97. After this subtraction, the amount of deductible expenses becomes $723,909.54 ($728,347.04 less $4,437.50 equals $723,909.54).

98. Further, Plaintiff claims that $5,000.00 to Mr. Garavaglia for "misc. expense" is unsubstantiated and, thus, should be subtracted; however, the Court finds that $5,000.00, the amount included on Defendants' list of expenses, is an accurate amount because of Defendant Tomei's supporting testimony and because two checks (Nos.2286, 2289) dated October 22, 2001, and November 6, 2001, show that Mr. Garavaglia was paid in excess of $5,000.00 for miscellaneous expenses. Def. Ex. 2A at 3; Def. Ex. 2; Tr. at 287–89.

99. Plaintiff also claims that $13,659.80 to Lincoln Brick for bricks is unsubstantiated and, thus, should be subtracted; however, the Court finds that $13,659.80, the amount included on Defendants' list of expenses, is an accurate expense because within Defendants' Exhibit 2 there is a statement, with a supporting invoice, from Lincoln Brick dated May 31, 2000, for $14,283.50 for Lot 14, and the handwriting on the invoice as well as the corresponding check (No. 1743) and the notations on that check indicate that $13,659.80 was paid to Lincoln Brick for bricks for Lot 14. Def. Ex. 2A at 2; Def. Ex. 2.

100. Plaintiff further claims that $384.25 to Smede–Son Steel and Supply is unsubstantiated and, thus, should be subtracted; however, the Court finds that $384.25, the amount included on Defendants' list of expenses, is an accurate expense because within Defendants' Exhibit 2 there is an invoice from Smede–Son Steel and Supply dated October 2, 2001, for $384.25 for Lot 14, and the corresponding check (No. 2268) indicates that this invoice was paid. Def. Ex. 2A at 4; Def. Ex. 2.

101. Plaintiff also claims that $396.00 to Specialty Floor Covering is unsubstantiated and, thus, should be subtracted; however, the Court finds that $396.00, the amount included on Defendants' list of ex-penses, is an accurate expense because within Defendants' Exhibit 2 there is an invoice from Specialty Floor Covering dated October 25, 2001, for $396.00 for additional floor stain for Lot 14 and the handwriting on the invoice indicates that this invoice was paid. Def. Ex. 2A at 4; Def. Ex. 2.

### E–4. Purported Interest Payment

102. An amount of $60,000.00 for a purported interest payment from Defendant Darmik to Defendant Tomei must be subtracted; Defendant Tomei admitted that there was no agreement for Defendant Darmik to pay interest to Defendant Tomei, and, more important, Defendant Tomei and Mr. Garavaglia admitted that, contrary to Defendants' representation on their list of expenses, Defendant Darmik has not made any interest payments to Defendant Tomei. Def. Ex. 2A at 4; Tr. at 190–91; 318–19.

103. After this subtraction, the amount of deductible expenses becomes $663,909.54 ($723,909.54 less $60,000.00 equals $663,909.54).

### E–5. Post–Transfer Expenses

104. Plaintiff claims that two expenses paid after Defendants transferred the Tomei Residence to Defendant Tomei's son via the quit claim deed of December 6, 2001, should be subtracted; the two expenses in question are $18,152.55 for the 2002 property taxes on the Tomei Residence and $8,000.00 to Blue Collar Enterprises for the aforementioned deck that was added to the Tomei Residence while it was for sale in 2002. Pl.Ex. 11; Def. Ex. 2A at 1, 4; Def. Ex. 2; Pl.Ex. 6 at 28; Tr. 210–11, 326, 360, 367–68.

105. Nonetheless, it is clear from Defendant Tomei's testimony that the transfer to Defendant Tomei's son was an intra-

family transaction and, if the Tomei Residence was sold, the property would be first transferred back to Defendants, and Defendants—not Defendant Tomei's son— would make the sale and realize the proceeds of the sale. Tr. 325–27, 352–54.

106. This finding is supported by the additional fact that it was Defendants—not Defendant Tomei's son—who placed the Tomei Residence on the market and who listed it with a real estate agent in 2002 and 2003 after the property was transferred to Defendant Tomei's son in 2001. Tr. at 266, 358–63, 365–74.

107. Therefore, for these reasons, the Court finds that the two aforementioned challenged expenses of $18,152.55 and $8,000.00 are deductible expenses for Defendants on the Tomei Residence. Def. Ex. 2A at 1, 4; Def. Ex. 2; Pl.Ex. 6 at 28.

### E–6. Cost of the Land

108. Lastly, an amount of $108,558.00 must be subtracted from Defendants' list of expenses; Defendants claim that the cost of Lot 14, the land on which the Tomei Residence is built, was $160,000.00; however, Defendants failed to provide any written documentation to support this claimed amount; nevertheless, Defendant Tomei's testimony revealed that Defendants spent $390,000.00 to purchase all twenty-two lots in the Whispering Pines Subdivision and spent another $500,000.00 for improvements for the entire subdivision (e.g., streets); apportioning this total of $890,000.00 ($390,000.00 plus $500,000.00 equals $890,000.00) among all the lots on a square foot basis reveals that $51,442.00 is the cost attributable to Lot 14, which covers 5.78 percent of the land in the entire Whispering Pines Subdivision (5.78 per-

cent of $890,000.00 equals $51,442.00); thus, since only $51,442.00 of the claimed $160,000.00 is allowable, the $160,000.00 claimed on the list of expense must be reduced by $108,558.00 ($160,000.00 less $51,442.00 equals $108,558.00). Def. Ex. 2A at 2; Def. Ex. 2; Tr. at 192, 312–13, 377–80; Def. Tomei Dep. (Nov. 22, 2002) at 16–19; Fed.R.Evid. 801(d).

109. Accordingly, after this final subtraction, the Court finds by a preponderance of the evidence that the amount of deductible expenses is **$555,351.54** ($663,-909.54 less $108,558.00 equals $555,351.54).

### III. CONCLUSIONS OF LAW

110. Again, Defendants admitted liability in this copyright infringement action on October 23, 2003; thus, Defendants are "infringers of copyright" as that term is used in 17 U.S.C. § 504, and the issue before the Court is Plaintiff's damages under § 504. Stip. Order (Oct. 23, 2003) at ¶¶ 1–2; 17 U.S.C. § 504.[4]

111. The applicable statutory formula for determining damages in this situation is straightforward and is set forth in 17 U.S.C. § 504(b). 17 U.S.C. § 504(a)(1).

112. Under § 504(b) Plaintiff is entitled two recover two types of damages: actual damages and infringer's profits. 17 U.S.C. §§ 504(a)(1), 504(b).

113. "These two methods of recovery available under § 504(b) serve two distinct purposes: [actual] damages are awarded to compensate the copyright owner for losses from the infringement, and profits are awarded to prevent the infringer from unfairly benefitting from a wrongful act." *Hamil Am., Inc. v. GFI, Inc.*, 193 F.3d 92,

---

4. Pursuant to the Court's summary judgment order of August 5, 2003, Plaintiffs are not entitled to statutory damages and are not entitled to attorney's fees. *See* Summary Judgment Order (Aug. 5, 2003) at 6–7; 17 U.S.C. § 412(1); 17 U.S.C. § 504(c); 17 U.S.C. § 505.

103 (2d Cir.1999) (internal quotations omitted).

## A. Actual Damages

114. Section 504(b) defines "actual damages" as those damages "suffered" by a copyright owner "as a result of the infringement." 17 U.S.C. § 504(b).

115. "[T]he proper measure of actual damages in a copyright infringement action regarding architectural plans" is " 'the lost fair market value of the architectural plans,' measured by, 'what a willing buyer would have been reasonably required to pay a willing seller for plaintiff's work.' " *Associated Residential Design v. Molotky,* 226 F.Supp.2d 1251, 1254 (D.Nev.2002) (quoting *Eales v. Envtl. Lifestyles, Inc.,* 958 F.2d 876, 880 (9th Cir.1992)); *see also Johnson v. Jones,* 149 F.3d 494, 507 (6th Cir.1998).

116. Accordingly, under this standard, the Court concludes, consistent with its above findings, that Plaintiff has met its burden of proving actual damages and that Plaintiff's actual damages are $24,952.00—the aforementioned fair market value of the plans in question. *Supra* ¶¶ 40–48; 17 U.S.C. § 504(b); *Associated Residential Design,* 226 F.Supp.2d at 1254.

## B. Infringer's Profits

117. In addition to actual damages, § 504(b) allows the copyright owner to recover damages commonly referred to as "infringer's profits," which are defined as "any profits of the infringer that are attributable to the infringement and are not taken into account in computing the actual damages." 17 U.S.C. § 504(b).

118. Section 504(b) further establishes the burdens of proof with regard to infringer's profits as follows: "In establishing the infringer's profits, the copyright owner is required to present proof only of the infringer's gross revenue, and the in-

fringer is required to prove his or her deductible expenses and the elements of profit attributable to factors other than the copyrighted work." 17 U.S.C. § 504(b).

119. As a consequence of this burden-shifting approach, "under § 504(b), all gross revenue is presumed to be profit attributable to the infringement, unless the infringer is able to demonstrate otherwise." *Nelson–Salabes, Inc. v. Morningside Dev., LLC,* 284 F.3d 505, 511–12 n. 9 (4th Cir.2002) (internal quotations omitted).

120. The purpose behind this approach is clear: "It is axiomatic that [one] who steals [an] architect's drawings and uses them as his own will not incur the same expenses that he would if he were forced to start from scratch. [Such infringers are] able to cut considerable costs, in terms of both effort and expensive delays.... Very often, the act of infringement allows the infringer to pocket as net profit a much larger percentage of his gross revenue than he could have absent the infringement. It is for precisely this reason that the Copyright Act shifts the burden of proving deductible expenses to the defendant after the plaintiff has proven gross revenue." *Johnson,* 149 F.3d at 506.

121. Turning to this case, Plaintiff is entitled to infringer's profits even though the infringing property, i.e., the Tomei Residence, has not been sold—such a rule is necessary to prevent Defendants from circumventing and thwarting the explicit purpose of § 504(b), which is to preclude copyright infringers from unfairly benefitting from their wrongful acts. *Associated Residential Design,* 226 F.Supp.2d at 1255–56.

122. Applying the above standards to this case, the Court concludes, consistent with its above findings, that Plaintiff has met its burden of proving Defendants' gross revenue and of proving that this revenue is causally connected to Defen-

dants' admitted infringement; the Court concludes, consistent with its above findings, that Defendants' gross revenue for purpose of § 504(b) is **$711,900.00**—the aforementioned fair market value of the Tomei Residence. *Supra* ¶¶ 49–61; 17 U.S.C. § 504(b); *Associated Residential Design,* 226 F.Supp.2d at 1255–56.

123. Additionally, the Court concludes, consistent with its above findings, that Defendants have proved **$555,351.54** in deductible expenses. *Supra* ¶¶ 62–109; 17 U.S.C. § 504(b).

124. Further, since Defendants' only proof concerning their profits was their aforementioned list of expenses, its accompanying invoices and checks and its corresponding testimony, any "elements of profit" under § 504(b) that are "attributable to factors other than the copyrighted work" are already incorporated into Defendants' aforementioned deductible expenses. 17 U.S.C. § 504(b); Def. Ex. 2A; Def. Ex. 2; Tr. at 175–76, 180–81.

125. Accordingly, for all of these reasons, the amount of infringer's profits to which Plaintiff is entitled is **$156,548.46** ($711,900.00 in gross revenue less $555,351.54 in deductible expenses equals $156,548.46 in infringer's profits). 17 U.S.C. § 504(b).

### C. Summary

126. Consequently, the total amount of damages to which Plaintiff is entitled is **$181,500.46** ($24,952.00 in actual damages plus $156,548.46 in infringer's profits equals $181,500.46). 17 U.S.C. § 504(b).

127. Additionally, Plaintiff, as the prevailing party, is entitled to recover its costs of action under 17 U.S.C. § 505 and Rule 54(d)(1) of the Federal Rules of Civil Procedure, but this recovery of costs shall not include attorney's fees. 17 U.S.C. § 412(1); 17 U.S.C. § 505; Fed.R.Civ.P. 54(d)(1); *Advanz Behavioral Mgmt. Res. v. Miraflor,* 21 F.Supp.2d 1179, 1192

(C.D.Cal.1998); Summary Judgment Order (Aug. 5, 2003) at 6–7; Jt. Final Pretrial Order at ¶ 2.

128. Further, Plaintiff is not entitled to pre-judgment interest as Congress has not made such relief available in the copyright-infringement setting. *Robert R. Jones Assocs., Inc. v. Nino Homes,* 858 F.2d 274, 282 & n. 8 (6th Cir.1988); Jt. Final Pretrial Order at ¶ 2.

129. As is customary, however, Plaintiff is entitled to post-judgment interest. 28 U.S.C. § 1961; Jt. Final Pretrial Order at ¶ 2.

### IV. ORDER

**ACCORDINGLY, IT IS HEREBY ORDERED** that Plaintiff shall recover from Defendants the amount of **$181,500.46**, with post-judgment interest thereon, and Plaintiff's costs of action (excluding attorney's fees).

**SO ORDERED.**