NOT RECOMMENDED FOR PUBLICATION

File Name: 20a0312n.06

No. 19-5491

## UNITED STATES COURT OF APPEALS
## FOR THE SIXTH CIRCUIT

SINGLETARY CONSTRUCTION, LLC,      )
                                   )
    **Plaintiff-Appellee,**         )
                                   )
v.                                 )
                                   )
REDA HOME BUILDERS, INC.; RICK     )
REDA; RAE GLEASON,                 )
                                   )
    **Defendants-Appellants.**      )

FILED
Jun 01, 2020
DEBORAH S. HUNT, Clerk

ON APPEAL FROM THE
UNITED STATES DISTRICT
COURT FOR THE MIDDLE
DISTRICT OF TENNESSEE

**OPINION**

BEFORE: MERRITT, MOORE, and MURPHY, Circuit Judges.

**KAREN NELSON MOORE, Circuit Judge.** Defendants Reda Home Builders, Inc.,

Rick Reda, and Rae Gleason challenge the monetary awards for which they are liable to Plaintiff

Singletary Construction, LLC. Singletary sued the defendants for copyright infringement and won

a judgment of $296,208.75 against Reda and $14,440.50 against Gleason. On appeal, the

defendants do not dispute that Singletary owned a valid copyright or that Reda infringed the

copyright. Their sole argument is that the jury verdict is excessive.[1] We agree as to Rick Reda

---

[1]In the "Statement of Issues" in Appellants' Brief, Reda asks this court to consider
"[w]hether the statements made by the judge during Reda's closing argument, tended to confuse
the jury regarding allowable expenses and gross profits." Appellants' Br. at 7. Next, the brief's
"Statement of the Case" reads: "During the closing argument of Reda, counsel was arguing the
deduction of allowable expenses when trial Judge McCalla interrupted and stated, 'That's just not
correct'." *Id.* at 10. Reda offers no argument on this issue in the remainder of the brief, and no
reply brief was submitted. "[A]rguments not raised in a party's opening brief, as well as arguments

and Reda Home Builders, Inc., and disagree as to Gleason. Therefore, we **AFFIRM** in part, **REVERSE** in part, and **REMAND** to the district court (as to Reda only) to calculate an appropriate remittitur and, if necessary, retry the damages issue.

## I. BACKGROUND

Reda Home Builders, Inc., owned by Rick Reda (collectively, "Reda"), and Singletary Construction, LLC, build houses. Singletary built a house at Lot 353 Farmington in Clarksville, Tennessee. R. 1 (Compl. ¶ 10) (Page ID #2–3). Real-estate agent Rae Gleason, on behalf of a client, submitted a contract to Reda "to build [the] same house as Lot 353 Farmington." R. 68 (Defs.' Resp. to Pl.'s Statement of Undisputed Material Facts ¶ 4) (Page ID #937). Reda accepted the contract and built the house. R. 1 (Compl. ¶¶ 27–28) (Page ID #5).

Singletary sued Reda and Gleason for copyright infringement, and the case was tried before a jury from April 1 through April 4, 2019. *See* R. 213–16 (Trial Trs. Vols. 1–4) (Page ID #2207–3280). The trial focused on liability for copyright infringement and damages, only the latter of which is relevant here. Specifically, although the parties agreed that the sale price for the copyright-infringing house was $320,900, R. 216 (Trial Tr. Vol. 4 at 82) (Page ID #3176); *id.* at 108 (Page ID #3203), they disagreed as to the amount that Reda and Gleason had profited from the sale. Reda argued that he had incurred significant expenses in the course of building the house, which would be deductible from his total revenue in calculating unlawfully earned profits owed to Singletary. The primary forms of evidence that Reda presented at trial regarding deductible expenses were (1) his testimony (both his videotaped deposition, which was played for the jury,

---

adverted to in only a perfunctory manner, are waived." *Kuhn v. Washtenaw County*, 709 F.3d 612, 624 (6th Cir. 2013). We conclude that Reda has abandoned this argument.

*see* R. 213 (Trial Tr. Vol. 1 at 89–99) (Page ID #2295–2305), and his testimony on the stand, *see* R. 215 (Trial Tr. Vol. 3 at 34–295) (Page ID #2679–2940)), (2) a Quickbooks spreadsheet, allegedly enumerating the various costs that he had incurred in building the house, and (3) other associated financial documents. Gleason argued that only $3,480 of the $14,440.50 she received as commission on the house constituted profits because she split the commission with another agent and paid a portion of her share to her brokerage company, R. 215 (Trial Tr. Vol. 3 at 379) (Page ID #3024), but because she failed to provide documents requested by Singletary during discovery, the district court instructed the jury to ignore her testimony regarding deductible expenses, R. 216 (Trial Tr. Vol. 4 at 150) (Page ID #3244). Gleason did not introduce documentary proof to support her testimony.

Prior to deliberations, the district court provided the jury with instructions, which included the following statements:

> A copyright owner is entitled to recover any of the infringer's profits that are attributable to infringement. In establishing the infringer's profits, the copyright owner is first required to present proof of the infringer's gross revenue associated with infringement.

> Once the copyright owner has met that initial burden, then the infringer is required to prove its deductible expenses and elements of profits attributable to factors other than the copyrighted work. Profit is calculated by subtracting all deductible expenses and nonattributable profits from gross revenue.
> . . .

> The defendant or defendants you're considering will have the burden of proving by a preponderance of the evidence the amount of deductible expenses that each incurred in producing the gross revenue that Singletary Construction has shown was related to infringement.
> . . .

> In order to deduct expenses from their gross revenue, the defendants must prove that they actually spent such amounts in the creation or selling of the infringing

house, and that such expenditures actually assisted in the creation or sale of the infringing house.

. . .

In your consideration of deductible expenses, you should not consider evidence of average or overall profit margins in determining direct expenses. In determining the direct expenses to deduct from gross revenues, you should rely only on evidence of specific expenses actually incurred.

Defendant has the burden of proving its deductible expenses by a preponderance of the evidence.

. . .

If you cannot find by a preponderance of the evidence that the defendant has proven that a category of indirect or overhead expenses actually assisted in the construction, marketing or sale of the infringing house, you should not deduct those expenses.

*Id.* at 147–51 (Page ID #3241–45). The jury found that Reda infringed Singletary's copyright and profited in the amount of $296,208.75, and that Gleason's profits in connection with the sale were $14,440.50.[2] *Id.* at 176 (Page ID #3270). Reda and Gleason moved for judgment notwithstanding the verdict, which the district court did not resolve. *Id.* at 178 (Page ID #3272). The next day, the district court entered judgment in the above amounts against Reda and Gleason, respectively. R. 167 (Judgment at 1) (Page ID #1948). On May 2, 2019, Reda and Gleason together filed a "Motion for a New T[ri]al, or in the Alternative, for Remitti[t]ur," without specifying whether they sought relief under Federal Rule of Civil Procedure 50 or 59. R. 172 (Mot. at 1) (Page ID #1989). Two days later, on May 4, the defendants filed a notice of appeal (and, on the same day, a corrected notice of appeal), which appealed "the final judgment entered in this action on the 5th day of April,

---

[2]It was not disputed that Gleason would be contributorily liable for infringement if any infringement occurred, so the verdict against Reda as to liability covered Gleason as well. R. 165 (Jury Verdict at 1–2) (Page ID #1936–37).

2019." *See* R. 175 (Corrected Notice of Appeal) (Page ID #1996). On May 23, the district court denied the defendants' motion. R. 186 (Order at 1) (Page ID #2124).

## II. DISCUSSION

### A. Jurisdiction

Although neither party raised the issue of jurisdiction on appeal, "we are under an independent obligation to police our own jurisdiction." *SEC v. Basic Energy & Affiliated Res., Inc.*, 273 F.3d 657, 665 (6th Cir. 2001). We undoubtedly have jurisdiction over Reda's appeal of the district court's judgment, entered on April 5, 2019, as Reda timely filed a notice of appeal of this judgment. *See* R. 175 (Corrected Notice of Appeal) (Page ID #1996). The question is whether we also have jurisdiction over the district court's order denying Reda's "Motion for a New T[ri]al, or in the Alternative, for Remitti[t]ur," which was entered *after* Reda filed its notice of appeal. Federal Rule of Appellate Procedure 3(c)(1)(B) requires that a notice of appeal "designate the judgment, order, or part thereof being appealed," and Reda's notice of appeal obviously did not designate that was appealing a later-entered order.

"Although a notice of appeal should be given a liberal construction, a court of appeals has jurisdiction only over the areas of a judgment specified in the notice of appeal as being appealed." *JGR, Inc. v. Thomasville Furniture Indus., Inc.*, 550 F.3d 529, 532 (6th Cir. 2008) (citing *Smith v. Barry*, 502 U.S. 244, 248 (1992)). The proper course would have been for Reda to file an amended notice of appeal, pursuant to Federal Rule of Appellate Procedure 4(a)(4)(B)(ii) ("A party intending to challenge an order disposing of any motion listed in Rule 4(a)(4)(A), or a judgment's alteration or amendment upon such a motion, must file a notice of appeal, or an amended notice of appeal--in compliance with Rule 3(c)--within the time prescribed by this Rule measured from

the entry of the order disposing of the last such remaining motion."). Still, notwithstanding technical deficiencies in notices of appeal, "our rule is that we will entertain arguments on all objections and asserted errors prior to the final disposition of a case if a party indicates in its notice of appeal that it appeals either the final judgment or the final order in the case." *Caudill v. Hollan*, 431 F.3d 900, 906 (6th Cir. 2005). We must therefore determine whether the substance of Reda's motion, and the subsequent order denying it, related to an objection raised prior to the April 5 entry of judgment. "What matters is that the issues flagged in the notice of appeal have already been raised." *Dice Corp. v. Bold Techs.*, 556 F. App'x 378, 383 (6th Cir. 2014). "The dividing line is the last appealed judgment: issues raised before the last appealed judgment will be considered, issues raised after will not." *Id.*

We conclude that the issues raised in Reda's motion for a new trial or remittitur were raised before the last appealed judgment. Were Reda mounting a first-time, weight-of-the-evidence challenge, we would be without jurisdiction to consider the district court's order denying its motion. "This court reviews weight-of-the-evidence challenges if the appellant first files a motion for a new trial (or a motion to alter or amend the judgment) and then appeals the denial of that motion." *Gruener v. Ohio Cas. Ins. Co.*, 510 F.3d 661, 665 (6th Cir. 2008) (citing *Pennington v. W. Atlas, Inc.*, 202 F.3d 902, 911 (6th Cir. 2000)). Because Reda's objection was not "raised for the first time" after the entry of judgment, however, we conclude that we have jurisdiction over the district court's subsequent order. *Aces High Coal Sales, Inc. v. Cmty. Bank & Tr. of W. Ga.*, 768 F. App'x 446, 448 (6th Cir. 2019). Before the entry of judgment, Reda objected to the judgment and asked for a judgment notwithstanding the verdict, R. 216 (Trial Tr. Vol. 4 at 178) (Page ID #3272), and the defense repeatedly pressed the issue of the proper calculation of damages

before the district court. Furthermore, although lack of prejudice is not dispositive here, *see United States v. Universal Mgmt. Servs., Inc.*, 191 F.3d 750, 756 (6th Cir. 1999), we note that "even if the notice of appeal is technically deficient, because no one is prejudiced by that defect, under our precedent, we should address the merits of the appeal." *Caudill*, 431 F.3d at 907; *see* Appellee Br. at 7 ("Appellants moved for a new trial or remittitur, focusing solely on the damage amount. The district court denied their motion. Appellants have appealed that decision."). To refuse consideration of the district court's order denying Reda's motion simply because Reda failed to file an amended notice of appeal, "we would be upholding form for form's sake, and would not advance justice in this case, or in general." *Caudill*, 431 F.3d at 907.

## B. Reda's Profits

Turning to the merits, we must decide in this case whether Reda, who largely failed to persuade a jury that he incurred deductible expenses in constructing a copyright-infringing house, can be liable for almost the full amount of revenue that he earned for selling this house. For the following reasons, we conclude that the jury appeared to abide by statutory law in rendering its monetary award, but common-law principles compel an adjustment of this award. *See Singletary Constr., LLC v. Reda Home Builders, Inc*, No. 3:17-CV-00374-JPM, 2019 WL 6870354, at *3 (M.D. Tenn. May 23, 2019) ("While in some ways the jury's verdict may appear to defy common sense, it is consistent with the law.").

The Copyright Act creates a burden-shifting framework in determining an infringer's recoverable profits: "In establishing the infringer's profits, the copyright owner is required to present proof only of the infringer's gross revenue, and the infringer is required to prove his or her deductible expenses and the elements of profit attributable to factors other than the copyrighted

work." 17 U.S.C. § 504(b). Singletary correctly argues that, in the context of damages for copyright infringement, well-established Sixth Circuit caselaw permits the jury to disbelieve a defendant's articulation of deductible expenses and award the plaintiff the full amount of gross revenue that the defendant earned from its infringement. We have explained that "[t]he only statutory requirement on a copyright owner is proving gross revenue, which is presumed to be the infringer's profits until the infringer proves otherwise." *Balsley v. LFP, Inc.*, 691 F.3d 747, 768 (6th Cir. 2012); *id.* at 769 ("If the infringing defendant does not meet its burden of proving costs, the gross figure stands as the defendant's profits.") (quoting *Andreas v. Volkswagen of Am., Inc.*, 336 F.3d 789, 797 (8th Cir. 2003)). On this point, "[t]he statute is clear and unambiguous." *Johnson v. Jones*, 149 F.3d 494, 506 (6th Cir. 1998).[3]

In this case, gross revenue was undisputed, and Reda's evidence as to deductible expenses was far from compelling. Beginning with Reda's testimony, it appears from the record that he may have seemed reluctant to rely on his own spreadsheet—which supposedly enumerated his expenses—at his deposition, stating to opposing counsel, "I'm going to let you read that, sir. I'm going to make sure I don't make an error there." R. 213 (Trial Tr. Vol. 1 at 99) (Page ID #2305).

---

[3]There is no dispute here—unlike in the majority of cases involving disgorgement of profits under 17 U.S.C. § 504(b)—that the profits were attributable to the infringement. *Cf. Thoroughbred Software Int'l, Inc. v. Dice Corp.*, 488 F.3d 352, 360–61 (6th Cir. 2007) ("Although Dice Corp.'s opaque pricing scheme admittedly makes it more difficult for Thoroughbred to meet its burden to show Dice Corp.'s gross revenue, this complication does not relieve Thoroughbred of its obligation to put forth evidence that would allow the trier of fact to determine what portion of Dice Corp.'s monthly customer fee was attributable to the infringing software."); *Grant Heilman Photography, Inc. v. McGraw-Hill Cos.*, 115 F. Supp. 3d 518, 535 (E.D. Pa. 2015) (addressing defendant's argument that there was no "causal nexus" between its infringements and the profits sought by plaintiff, because the infringing contents it incorporated in its textbooks "were very minor parts of very large textbooks consisting of hundreds of pages of text and many photographs").

At trial, Reda was able to provide explanations for most of the expenses listed on the spreadsheet, but occasionally could not, *see, e.g.*, R. 215 (Trial Tr. Vol. 3 at 152) (Page ID #2797) ("Q: Okay. Now, you have a bill here that says various materials. Do you actually know what that is? . . . A: No, ma'am, I don't."); *id.* at 265 (Page ID #2910) (confirming that Reda was "speculating" regarding a $180.00 amount on the Quickbooks spreadsheet), and his identifications of particular expenses were often vague. Furthermore, Reda's explanation for why the item listed as "Sold to Phillip Walters" read "309,706.19"—and not the amount for which he sold the house ($320,900)— was confusing and inconclusive. *Id.* at 240 (Page ID #2885). Counsel for Singletary also elicited testimony from Reda that he borrowed approximately $254,000 from Heritage Bank, *id.* at 259 (Page ID #2904), but confirmed with Reda that the only construction loan appearing on the Quickbooks spreadsheet was for $45,000 (for the purchase of the lot where the house was built), *id.* at 265 (Page ID #2910).

Reda's documentary proof was similarly vulnerable to attack. First, the Quickbooks spreadsheet—which Reda's counsel said reflected "every single expense that he had building this house," R. 216 (Trial Tr. Vol. 4 at 79) (Page ID #3173)—only contained one date (August 18, 2017), which was after the litigation in this case had begun. R. 1 (Complaint at 1) (Page ID #1) (complaint filed Feb. 17, 2017). Singletary's counsel argued that this showed that the sheet was "manufactured" for trial, R. 216 (Trial Tr. Vol. 4 at 64) (Page ID #3158); Reda's counsel, rejecting that assertion, responded that August 18, 2017, was simply the date the document was printed, *id.* at 79 (Page ID #3173). But Reda never attested to entering the numbers on the spreadsheet at the time he paid the bills. Indeed, the spreadsheet actually contained Reda's legal fees in connection with the litigation, *see* R. 215 (Trial Tr. Vol. 3 at 245) (Page #2890), indicating that the document

was an unreliable, after-the-fact record. *See* R. 216 (Trial Tr. Vol. 4 at 64) (Page ID #3158) ("So remember how Mr. Reda testified that this is an accurate document? Do you remember some of the inaccuracies? It included his own legal fees. That's not a cost related to the construction of this house.").

Second, as Reda acknowledged on the stand, expense amounts listed on the spreadsheet for CEMC, Clarksville Gas & Water, Jason Hall, Kennedy's Septic Tank Service, Inc., TBC Concrete, and Thomas Boyd Home Repair were inconsistent with amounts appearing on corresponding receipts and invoices in an accompanying exhibit. R. 215 (Trial Tr. Vol. 3 at 251–58) (Page ID #2896–2903); *see* R. 216 (Trial Tr. Vol. 4 at 65) (Page ID #3159) ("There's no way to verify that these are moneys actually spent. Did you see the invoices that we looked at yesterday? Remember, some of those. And those invoices, they did not total up -- we saw discrepancies."). Third, Singletary's counsel demonstrated to the jury that in Reda's application to Montgomery County for a Single Family Dwelling Permit, he estimated that his costs would be $135,000, which was significantly less than the costs he ended up claiming at trial that he had incurred, *see* R. 216 (Trial Tr. Vol. 4 at 111) (Page ID #3205) ("Look what he put as his estimated cost, $135,000. Was he that far off budget? This is a man who builds a hundred houses a year."). In light of these flaws in Reda's defense, one could not fault the jury for concluding that Reda failed to carry his burden in demonstrating deductible expenses.

In assessing the jury award, however, we are guided not only by the procedures set forth in the Copyright Act § 504(b), but also by the common law. *See Wallace v. FedEx Corp.*, 764 F.3d 571, 591 (6th Cir. 2014). Under the Seventh Amendment, "no fact tried by a jury, shall be otherwise reexamined in any Court of the United States, than according to the rules of the common

law." U.S. CONST. amend. VII. As we summarized in *Lulaj v. Wackenhut Corp.*, 512 F.3d 760 (6th Cir. 2008), "[t]here are two sources of authority whereby a judge may reduce an award of damages rendered by a jury without violating the Seventh Amendment." *Id.* at 766. "First, a judge may offer a prevailing plaintiff the option of either a new trial or a reduced award in a process known as remittitur." *Id.* (citing *Farber v. Massillon Bd. of Educ.*, 917 F.2d 1391, 1395 (6th Cir. 1990)). "Second, a court may render judgment as a matter of law as to some portion of a jury award if it is compelled by a legal rule or if there can be no genuine issue as to the correct calculation of damages." *Id.* We consider only the first source of authority here, as Reda presents no argument that a portion of the award is compelled by legal rule or that there is no genuine issue about how to calculate it.

Under the first source of authority, "[a] court should not reduce an award unless it is: 1) beyond the range supported by proof; 2) so excessive as to shock the conscience; or 3) the result of mistake," and on appeal, we do not reverse a district court's application of this standard unless the district court abused its discretion. *Denhof v. City of Grand Rapids*, 494 F.3d 534, 547 (6th Cir. 2007). Reversal is therefore appropriate only when we have "a definite and firm conviction" that the district court made a clear error of judgment. *Mich. First Credit Union v. Cumis Ins. Soc'y, Inc.*, 641 F.3d 240, 245 (6th Cir. 2011) (citation omitted); *see Lewis v. Sears, Roebuck & Co. (In re Lewis)*, 845 F.2d 624, 635 (6th Cir. 1988) ("Where a jury grants a particular damage award and the district court refuses to disturb that finding, an appellate court should be certain indeed that the award is contrary to all reason before it orders a remittitur or a new trial."). Even when the award rendered is based on statutory disgorgement of profits, such as in the Copyright Act § 504(b), our common-law standard for evaluating such an award—and whether remittitur is appropriate—

11

applies. *See Balsley*, 691 F.3d at 771 (asking whether the amount of profits awarded to the plaintiffs, pursuant to the Copyright Act § 504(b), "clearly exceed[s] the maximum or shock[s] the conscience").

In our view, the jury was entitled by statute to disbelieve Reda's evidence regarding his deductible expenses, but if our analysis concluded there, we would be left with a result that would stand "contrary to all reason." *In re Lewis*, 845 F.2d at 635. Put simply, the jury's verdict represents a determination that Reda spent only $24,691.25 in deductible expenses in constructing a house that he sold for $320,900.[4] The only discrete expense that we can infer from the record is $5,447.69 for closing costs, which Singletary conceded was reliable. R. 216 (Trial Tr. Vol. 4 at 67–68) (Page ID #2161–62); Pl.'s App'x, Trial Ex. 3. This means that, according to the jury— and the district court, in subsequently upholding the jury verdict—the remaining $19,243.56 was sufficient for Reda to construct the house. Alternatively, the jury may not have believed that this amount realistically represented Reda's net profit, but heeded Singletary's counsel's statement that the jurors "cannot use [their] common sense . . . to say, well, of course he had costs." R. 216 (Trial Tr. Vol. 4 at 65) (Page ID #3159). Either way, we are asked to uphold a profit amount that is plainly absurd, particularly in light of Reda's estimated costs of $135,000 as submitted to Montgomery County—a number that Singletary did not challenge as unreasonable. *See* R. 216 (Trial Tr. Vol. 4 at 111) (Page ID #3205).

---

[4]The jury found Reda's profits to be $296,208.75. R. 216 (Trial Tr. Vol. 4 at 176) (Page ID #3270). The parties agree that $320,900 was the sales price. *Id.* at 67 (Page ID #3161); R. 215 (Trial Tr. Vol. 3 at 225) (Page ID #2870); Pl.'s App'x, Trial Ex. 8. The difference between the two—$24,691.25—thus represents deductible expenses as found by the jury.

This conclusion is supported by deeper examination of the rationales provided in our caselaw for requiring copyright infringers to prove their deductible expenses with specificity, and the inapplicability of these rationales to the case at hand. The first rationale, as we explained in *Johnson v. Jones*, 149 F.3d 494 (6th Cir. 1998), is that allowing an infringer to resort to proof of average costs would often overlook the primary advantage of infringement: "It is axiomatic that an architect who steals another architect's drawings and uses them as his own will not incur the same expenses that he would if he were forced to start from scratch." 149 F.3d at 506. The *Johnson* axiom, even taken to an extreme, makes sense when there are not substantial, inherent costs incurred by an infringer who unlawfully reproduces a copyrighted work. For example, if one author steals another author's 800-page, copyrighted manuscript and successfully self-publishes the book, earning substantial revenue in the process, the infringing author clearly has not incurred the same expenses as the original author and may have incurred almost no expenses at all. The statute accordingly places the burden on the infringing author to prove any costs that she or he incurred.

Second, when defendants operate in an industry that allows infringing products to be created without incurring additional costs specific to those products, it makes sense to require defendants "to prove their deductible expenses with particularity." *Singletary*, 2019 WL 6870354, at *2. Otherwise, the defendant can inappropriately profit by claiming that already-existing costs were attributable to the infringement, and deducting those from the profits awarded to the plaintiff. *See Sheldon v. Metro-Goldwyn Pictures Corp.*, 309 U.S. 390, 406 (1940) ("Where there is a commingling of gains, [a defendant] must abide the consequences, unless he can make a separation of the profits so as to assure to the injured party all that justly belongs to him."). For example, in

13

*Frank Music Corp. v. Metro-Goldwyn-Mayer, Inc.*, 772 F.2d 505 (9th Cir. 1985), the Ninth Circuit considered the infringement of a musical stage production of *Kismet* by Defendant MGM, whose 100-minute-long *Hallelujah Hollywood* musical revue included an 11.5-minute Act IV entitled "Kismet," which mirrored the plaintiffs' original play. *Id.* at 510. MGM argued that, even if it profited from the infringement, it should be permitted to deduct from gross revenue certain expenses associated with production. The Ninth Circuit disagreed. In assessing deductible expenses, the court held that MGM had "offered no evidence of what costs were included in general categories such as 'general and administrative expenses,' nor did they offer any evidence concerning how these costs contributed to the production of *Hallelujah Hollywood*." *Id.* at 516. Thus, when a jury cannot determine whether creation of the infringing product would necessarily require additional costs, it must give the plaintiffs "the benefit of every doubt" and decline to deduct these expenses from gross revenue. *Sheldon*, 309 U.S. at 408.

Based on these rationales, most decisions rejecting defendants' attempts to demonstrate deductible expenses have awarded the full amount of revenue to the plaintiff. *See, e.g.*, *Johnson*, 149 F.3d at 506 (reversing district court's award of 15% of revenue to the plaintiff when defendant-architect testified that he "averaged" a 15% profit and awarding the full amount of revenue as profits; the defendant "provided no evidence of his deductible expenses"); *Universal Furniture Int'l, Inc. v. Collezione Europa USA, Inc.*, 618 F.3d 417, 441 (4th Cir. 2010), *as amended* (Aug. 24, 2010) (district court did not commit error in rejecting defendant's attempts to show deductible expenses, which were "confusing, unreliable, and internally inconsistent" (quoting district court)); *Blackman v. Hustler Magazine, Inc.*, 800 F.2d 1160, 1163 (D.C. Cir. 1986) (rejecting "the learned district judge's attempt to do justice and avoid what may be a windfall to Blackman," when

14

defendant made a "feeble effort" to establish attributable expenses); *Williams v. Arndt*, 626 F. Supp. 571, 582 (D. Mass. 1985) ("Arndt kept no credible records. He claimed to have recalculated his expenses and income from the numerous checks he claimed were available to him and to his brother in Chicago, an accountant. The income statements . . . were completely unsupported, were prepared for use in this litigation and, in short, were completely unreliable. The defendants have not proven any deductible expenses and, therefore, I award the gross revenue from the sale of the infringing programs."); *Gaste v. Kaiserman*, 683 F. Supp. 63, 65–66 (S.D.N.Y. 1988) ("At the trial, Fermata deliberately chose not to produce a single document from its books and records to substantiate any alleged expenses. It submitted only the face sheet of its tax return for each year involved. Having produced nothing more, the Court has no basis for ruling that the jury acted unreasonably when it found that Fermata failed to prove, by a preponderance of the evidence, that all of the costs which it sought to deduct as expenses were actually attributable to 'Feelings.'").

The foregoing rationales and caselaw, however, have questionable applicability to this case. First, the rationale of *Johnson*—that courts should reject infringers' proof of "average margin[s] of profit" because infringement inherently allows infringers to cut costs, 149 F.3d at 506—has limited relevance when, as here, the infringer does not primarily rely on averages in attempting to demonstrate deductible expenses but rather on evidence of specific costs. Nor is the concern about defendants improperly deducting generalized overhead expenses present here; the bulk of Reda's purported costs were related to the construction of this specific house, not expenses that Reda would have incurred anyway in the general operation of his business. *See* Pl.'s App'x, Trial Ex. 3.

15

Furthermore, the few Sixth Circuit cases addressing the calculation of profits for purposes of the Copyright Act § 504(b) have not involved awards that ignored significant costs that the defendant must have incurred in creating the infringing product. The closest case is *Johnson*, in which an infringing architect admitted to making $16,560 in gross revenue and improperly testified about his "average" costs. 149 F.3d at 506. In reversing the district court's award and granting the plaintiffs the full amount of the architect's gross revenue, this court ignored any possible costs that the architect may have incurred in working on the infringing project. Yet, as his relatively small amount of revenue indicates, the architect's involvement in the project was limited to his role as architect, and he likely did not incur significant construction costs; indeed, a different party was retained to build the house. *Id.* at 499.

The other principal Sixth Circuit case on profit calculation under the Copyright Act § 504(b), *Balsley v. LFP, Inc.*, 691 F.3d 747 (6th Cir. 2012), addressed only whether the defendant's profits were attributable to its infringing activity; the defendant did not argue that it was entitled to deduct expenses related to the infringement. *Id.* at 770–71. The same is true of the two lower-court cases cited by Singletary on appeal: Neither involved district courts or juries ignoring significant costs that the defendants argued they must have incurred and awarding the plaintiffs the full (or nearly full) amount of gross revenue. *See Frank Betz Assocs., Inc. v. Signature Homes, Inc.*, No. 3:06-CV-00911, 2012 WL 13041831, at *12 (M.D. Tenn. Apr. 23, 2012) ("Defendants contend that the sales prices are not sufficient because they include revenue 'attributable to a litany of elements' other than the houses themselves, such as the value of the lot, landscaping, paving driveways and sidewalks, and HVAC systems."); *Wilcom Pty. Ltd. v. Endless Visions*, No. 98-71421, 1999 WL 33229745, at *2 (E.D. Mich. June 17, 1999) ("The Defendants

16

claim only that because the copyright at issue was obtained on March 20, 1998 that Plaintiffs cannot recover for any acts of infringement that occurred before the registration date."). Thus, these cases—which Singletary suggests stand for applying the Copyright Act § 504(b) rigidly when the plaintiff has demonstrated gross revenue and the defendant has failed to demonstrate deductible expenses with specificity—do not offer much guidance here.

In a handful of cases, courts have recognized the problem of completely ignoring inherent expenses that an infringing defendant has incurred. Perhaps most directly, in a case involving a gross revenue amount of approximately $1 million, and inconsistent, incomplete evidence of deductible expenses, one district court explained:

> [I]t is difficult to fault the jury for declining to take this evidence [of deductible expenses] at face value.
>
> But this does not settle the question of what would constitute an "egregious" jury verdict in light of the evidence—there is a limit to how deeply the jury could reasonably have disbelieved defendants' testimony. Had the jury concluded that, contrary to defendants' evidence, defendants had incurred no expenses at all, or only one or two hundred thousand dollars over five years, it would be clear that the court should vacate the verdict on damages. There is simply no support for so deep a skepticism of the defendants' evidence.

*Keeling v. New Rock Theater Prods.*, LLC, No. 10 CIV 9345, 2013 WL 2257072, at *6 (S.D.N.Y. May 23, 2013); *see also Neal v. Thomas Organ Co.*, 241 F. Supp. 1020, 1022 (S.D. Cal. 1965) ("After reviewing the evidence, and particularly the testimony of Mr. Silliman, the court believes it is fair and reasonable to find that said per cent [14.7%] for indirect costs should be deducted from the gross receipts. It is common knowledge that any business has indirect costs and this per cent should apply in the selling and handling of the courses by defendant the same as it would

apply in the handling of any other items."). Although most courts addressing this issue tend to rest their conclusions on the unambiguous text of the Copyright Act § 504(b), *Blackman*, 800 F.2d at 1164 ("In sum, we see this as a simple case. Plaintiff carried its burden; defendant did not."), there is thus some support within copyright law for a commonsense approach to excessive awards of profits. Whether or not Reda's burden was easy or difficult to carry, it cannot be interpreted to permit the plaintiff to collect the full amount of gross revenue when such a result simply defies common sense.

The need for a common-law backstop to profit disgorgement under the Copyright Act § 504(b) is all the more evident in comparing this provision, which deals with "Actual Damages and Profits," to the provision of the Copyright Act setting forth—and, importantly, capping— "Statutory Damages" at absolute dollar amounts. *See* 17 U.S.C. § 504(c). Unlike in the statutory-damages provision (§ 504(c)), there is no safeguard in the actual-damages-and-profits provision (§ 504(b)) that restricts the amount of disgorged profits that a plaintiff can receive. As one district court has explained, "in the specific context of statutory damages," the presence of an "upper bound on the damages that a jury can award" has the effect of "mitigat[ing] the risk of a truly untethered award." *Agence France Presse v. Morel*, No. 10-CV-2730 AJN, 2014 WL 3963124, at *15 (S.D.N.Y. Aug. 13, 2014). This counsels against finding an award of statutory damages to be excessive, because the statute itself provides the limit. *Id.* The opposite is true of an award of profits, in which the only safeguard against an unreasonable verdict is the court's determination that the award is contrary to all reason. *In re Lewis*, 845 F.2d at 635.

For the foregoing reasons, we conclude that the jury's award shocks the conscience, and the district court erred in denying Reda's motion for a new trial, or, in the alternative, a remittitur.

We remand to the district court, as to Reda, for a calculation of an appropriate remittitur, or to retry the damages issue. *See Lentz v. City of Cleveland*, 333 F. App'x 42, 50 (6th Cir. 2009).

**C. Gleason's Profits**

On appeal, Gleason argues that she "paid another agent for the procurement of the sale," and that the jury was mistaken in failing to consider this a deductible expense. Appellants' Br. at 15. We are satisfied that the district court did not err in denying her motion for a new trial or remittitur on this basis. At trial, Gleason offered only her testimony that her $14,440.50 commission was "divided between four people": RE/MAX Executives (of which she was a co-owner, R. 215 (Trial Tr. Vol. 3 at 381) (Page ID #3026)), RE/MAX International (the franchising company), Heather Chase (another agent with whom she shared commissions), and herself. *Id.* at 379 (Page ID #3024). Although she provided detailed explanations on the stand for how and why she shared her commission with these other parties, she failed to explain why she had not provided any written documentation of these financial exchanges, after confirming that such documentation existed. *Id.* at 404–05 (Page ID #3049–50) ("Q: You never did provide any written documentation that you just told me exists, the paper trail, the checks, the statements. None of that was ever produced to us in discovery, was it? A: I am not sure."). As the district court reminded the jury before deliberations, Gleason "failed to supply documents requested by the plaintiff in th[is] regard," and the district court instructed them not to consider her testimony regarding her expenses. R. 216 (Trial Tr. Vol. 4 at 150) (Page ID #3244). Furthermore, hers is the only name to appear on the contract for the sale of the house. *See* Pl.'s App'x, Trial Ex. 8. Even if the jury ignored the district court's instructions and considered Gleason's testimony regarding her deductions, she provided no documentary evidence that any portion of the $14,440.50 was distributed to or

retained by another party. Accordingly, the district court did not err in denying Gleason's motion for new trial or remittitur on this issue.

## III. CONCLUSION

For the foregoing reasons, we **AFFIRM** as to Gleason, **REVERSE** as to Reda, and **REMAND** to the district court to calculate an appropriate remittitur for the award rendered against Reda and, if necessary, to retry the damages issue.

MURPHY, J., concurring in part and dissenting in part. When a party infringes a copyright, the Copyright Act allows a copyright owner to recover the infringer's "profits," a term that usually means revenues less expenses. 17 U.S.C. § 504(b). But the Act creates a bifurcated scheme for calculating profits. It requires the copyright owner initially to present proof of "the infringer's gross revenue" to show the infringer's profits. *Id.* The Act then shifts the burden to the infringer "to prove his or her deductible expenses[.]" *Id.* What happens if an owner proves that the infringer had $1 million in gross revenue from an infringement, but the infringer stubbornly refuses to introduce *any* evidence of its expenses? The Act's "unambiguous" text requires the owner to receive the gross revenue—the full $1 million—as the profits. *Johnson v. Jones*, 149 F.3d 494, 506 (6th Cir. 1998). That is true even if common sense tells us the infringer must have incurred some costs, for "we are not free to temper the scheme provided by Congress" with our own views of "justice." *Blackman v. Hustler Magazine, Inc.*, 800 F.2d 1160, 1163 (D.C. Cir. 1986).

The statute's plain text decides this case. A homebuilder, Reda Home Builders and Rick Reda (collectively, "Reda"), and a real-estate agent, Rea Gleason, infringed the copyright in a home owned by a competing homebuilder, Singletary Construction. At trial Singletary met its burden to show Reda's and Gleason's gross revenue from this infringing home: $320,900 for Reda (the sale price) and $14,440.50 for Gleason (her commission). Yet after the burden shifted to Reda and Gleason, they made little effort to meet it: Reda sought to show its expenses with an unreliable spreadsheet; Gleason offered no documentary proof to show hers. The jury thus awarded Singletary $296,208.75 for Reda's profits, which suggests it found that Reda proved only $24,691.25 in expenses when building the home. And the jury awarded Singletary $14,440.50 for Gleason's profits, which suggests it found that she proved no expenses when selling the home.

21

Challenging the monetary awards, Reda and Gleason asked the district court to grant them either judgment as a matter of law under Federal Rule of Civil Procedure 50(b) or a remittitur (or a new trial) under Rule 59(a). *Singletary Constr., LLC v. Reda Home Builders, Inc.*, 2019 WL 6870354, at *1 (M.D. Tenn. May 23, 2019). The district court found that the jury's award did not shock the conscience so as to justify any type of judicial reduction. *Id.* at *3. It opined that the jury was free to disregard Reda's spreadsheet, a made-for-litigation document containing many holes. *Id.* at *2. And it said that, while the verdict "may appear to defy common sense," the jury's award adhered to the Copyright Act's burden-shifting approach to establishing profits. *Id.* at *3.

Failing to prove their case to the jury or the district court, Reda and Gleason turn to us. While I agree with my colleagues' decision to affirm the verdict as to Gleason, I see no error in the district court's refusal to grant a remittitur to Reda. So I would affirm the judgment outright. Because Singletary established that Reda's gross revenue was $320,900 and because Reda failed to reliably show most of its costs, the jury's award was supported by legally sufficient evidence. My colleagues do not dispute that point because they reject Reda's request for judgment as a matter of law under Rule 50(b). But they still overturn the district court's denial of a remittitur under Rule 59(a) based on the "common sense" notion that Reda had more than $24,691.25 in expenses when building the $320,900 home. Respectfully, this conclusion overlooks our standard of review, Congress's statutory scheme, and relevant precedent from the circuit courts.

Start with the standard of review. We operate against the backdrop of the Seventh Amendment. It bars courts from "re-examin[ing]" any "fact tried by a jury" except "according to the rules of the common law." U.S. Const. amend. VII; *Feltner v. Columbia Pictures Television, Inc.*, 523 U.S. 340, 348–55 (1998). Some have suggested that the common law categorically

barred an appellate court from reviewing a trial court's discretionary denial of a motion for a remittitur. *Gasperini v. Ctr. for Humanities, Inc.*, 518 U.S. 415, 457–58 (1996) (Scalia, J., dissenting); *cf. Portman v. Am. Home Prods. Corp.*, 201 F.2d 847, 848 (2d Cir. 1953) (Hand, J.). While the Supreme Court has held that we may now engage in this type of appellate reexamination of jury awards, it did so only by highlighting the review's deferential nature. *See Gasperini*, 518 U.S. at 419, 438–39. Courts must review a district court's decision for an abuse of discretion and "give the benefit of every doubt to the judgment of the trial judge[.]" *Id.* at 435 (quoting *Dagnello v. Long Island R.R. Co.*, 289 F.2d 797, 806 (2d Cir. 1961)). We have thus said that "[w]e will not disturb a decision to deny a new trial or remittitur absent a clear showing of abuse of discretion." *Agristore Leasing v. A.O. Smith Harvestore Prods., Inc.*, 869 F.2d 264, 268 (6th Cir. 1989).

Not only that, district courts themselves face a tall order before they may grant a remittitur. *See Wallace v. FedEx Corp.*, 764 F.3d 571, 591 (6th Cir. 2014); *Balsley v. LFP, Inc.*, 691 F.3d 747, 771 (6th Cir. 2012). Courts may grant a remittitur "only" in limited circumstances, such as when an award is so excessive as to "shock the judicial conscience of the court." *Wallace*, 764 F.3d at 593 (citation omitted). While I find this sort of shocks-the-conscience test "more than a little 'open-ended,'" *Jane Doe v. Jackson Local Sch. Dist. Bd. of Educ.*, 954 F.3d 925, 933 (6th Cir. 2020) (citation omitted), the test at least conveys a general mood—that the district courts should rarely invoke their remittitur power. When deciding whether an award is conscience-shocking, moreover, a "trial court may not substitute its judgment or credibility determinations for those of the jury." *Farber v. Massillon Bd. of Educ.*, 917 F.2d 1391, 1395 (6th Cir. 1990). The evidence instead must be viewed "in the light most favorable to the awardee." *Id.*

Next consider Congress's statutory framework. The Copyright Act permits copyright owners to receive the infringer's profits from infringement. It then states: "In establishing the infringer's profits, the copyright owner is required to present proof only of the infringer's gross revenue, and the infringer is required to prove his or her deductible expenses and the elements of profit attributable to factors other than the copyrighted work." 17 U.S.C. § 504(b). This text is "clear and unambiguous" on how to calculate profits. *Johnson*, 149 F.3d at 506. The copyright owner need "only" prove the infringer's "gross revenue," which stands as the infringer's "profits" unless the infringer comes forward with evidence of its "expenses." 17 U.S.C. § 504(b).

Lastly consider precedent. We have said that "[t]he only statutory requirement on a copyright owner is proving gross revenue, which is presumed to be the infringer's profits until the infringer proves otherwise." *Balsley*, 691 F.3d at 768. So "[i]f the infringing defendant does not meet its burden of proving costs, the gross figure stands as the defendant's profits." *Id.* at 769 (citation omitted). In *Johnson*, for example, a district court awarded only 15 percent of an infringing architect's gross revenue as profits because he testified that he averaged a 15-percent profit margin. 139 F.3d at 506. We reversed, holding that the court should have awarded the infringer's gross revenue because he "failed to provide any evidence of deductible expenses." *Id.*

Our sister circuits follow the same law. *See Mon Cheri Bridals, Inc. v. Wen Wu*, 383 F. App'x 228, 239–40 (3d Cir. 2010); *Update Art, Inc. v. Modiin Publ'g, Ltd.*, 843 F.2d 67, 70, 72 (2d Cir. 1988); *Blackman*, 800 F.2d at 1163; *cf. Russell v. Price*, 612 F.2d 1123, 1130–31 (9th Cir. 1979). In *Mon Cheri*, for example, the plaintiff carried its burden to establish gross revenues for copyright infringement on its dresses by proving "the number of dresses" the defendants sold "and the price" they charged. 383 F. App'x at 240. The defendants "testified regarding the net profits

24

and costs associated with these sales," but did not present any other evidence, "such as purchase orders or bills." *Id.* The Third Circuit upheld the jury's award of the defendants' revenues as profits, concluding that the jury "likely discredited" the defendants' "testimony on costs in reaching its award, which is permitted under the Copyright Act." *Id.* The D.C. Circuit followed similar reasoning in *Blackman* when it affirmed an award of gross revenues as profits. There, the plaintiff "carried its burden in establishing the revenues," but "[t]here was then a failure of proof on [the defendant's] part in establishing expenses." 800 F.2d at 1163. As the court explained, "[s]ince the statutory scheme calls for subtracting defendant's proof from that of the plaintiff, and since defendant's proof was found to be zero, the figure proven by plaintiff winds up establishing the profits[.]" *Id.* at 1164.

Applying our deferential standard of review to this legal framework, I see no basis to find the jury's award conscience-shocking. Singletary established Reda's gross revenue by proving that Reda sold the infringing house for $320,900. But Reda largely failed to establish its expenses. It relied almost entirely on a spreadsheet that provided a summary of *bills received*, not *expenses paid*. The spreadsheet contained no information proving that Reda paid the bills. And the few receipts that Reda introduced showed that it paid far less than the listed amounts. The spreadsheet also included questionable bills, such as Reda's legal fees for defending this suit. And it double-counted some expenses. The jury thus could reasonably disregard this spreadsheet, which it did (implicitly) by finding that Reda proved under $25,000 in costs. As the district court noted, this amount "suggests that the jury might have deducted those expenses as to which [Reda] produced actual documentary evidence of payments made." *Singletary Constr.*, 2019 WL 6870354, at *3.

I would not describe an award that correctly applies Congress's statutory formula to the trial's record evidence as shocking the conscience. I would describe it as following the law.

Reda's problem is also one of its own making. *See Blackman*, 800 F.2d at 1162–64. It, for example, failed to produce some 94 receipts that it claimed showed its expenses until a month before trial. The district court refused to allow Reda to introduce these receipts, noting that "sometimes you just have to pay the price" of failing to fulfill discovery obligations. Other circuits have affirmed similar awards when the defendants' "unjustified failure to respond to discovery orders was the *cause* of the lack of evidence" showing their costs. *Update Art*, 843 F.3d at 72. Reda does not challenge this discovery-related decision on appeal, and we should not use any remittitur authority to excuse Reda's lackadaisical attitude toward discovery.

The majority's contrary rationales do not convince me otherwise. My colleagues concede that the jury could reasonably disbelieve the evidence on which Reda relied to prove its expenses. Majority Op. 13. They nonetheless adopt Reda's argument: that it is absurd to think that Reda could have constructed a $320,900 house for less than $25,000. I agree with the instinct. But I have a common-sense rejoinder: It should not have been difficult for Reda to introduce proof of its expenses—as the statute's plain text required it to do. 17 U.S.C. § 504(b). And I do not think courts are free to turn their remittitur power into "a free-ranging search for the best copyright policy"; instead, courts should apply that power in a way that "give[s] effect to the clear meaning of [the Copyright Act] as written." *Star Athletica, L.L.C. v. Varsity Brands, Inc.*, 137 S. Ct. 1002, 1010 (2017) (citation omitted). If Reda failed to prove its costs, the Act tells us what to do: "the gross figure stands as [its] profits." *Balsley*, 691 F.3d at 769 (citation omitted).

My colleagues also agree that many cases have awarded gross-revenue amounts when an infringer failed to establish its expenses. Majority Op. 15–16; *see, e.g.*, *Johnson*, 149 F.3d at 506–07; *Blackman*, 800 F.2d at 1163–64. But they say that a "deeper examination" of the relevant cases shows that their rationales do not extend to this case. Majority Op. 13. In *Johnson*, for example, we identified Congress's purpose behind shifting the burden to an infringer to prove costs: "Very often, the act of infringement allows the infringer to pocket as net profit a much larger percentage of [its] gross revenue than [it] could have absent the infringement." 149 F.3d at 506. The majority notes that this rationale makes sense for architects (who likely have low marginal costs in replicating stolen designs), but not homebuilders (who likely have high marginal costs in constructing infringing homes). Majority Op. 16–17. Yet *Johnson* relied on this alleged purpose only to reinforce the statute's "clear and unambiguous" text: that a copyright owner should receive the infringer's gross revenue if the infringer does not adequately prove its deductible expenses. 149 F.3d at 506. *Johnson* did not read the statute as applying a burden-shifting framework on a case-by-case basis depending on whether the infringer has low marginal costs. The text provides no indication that the specific infringer's industry or business structure matters for purpose of calculating profits. Indeed, "no legislation pursues its purposes at all costs." *Rodriguez v. United States*, 480 U. S. 522, 525–26 (1987) (per curiam). Here, a countervailing purpose (administrative efficiency) likely led Congress to adopt a clear burden-shifting rule, rather than a vague standard tied to each infringer's cost structures.

The history of copyright protection for buildings proves my point. The Copyright Act originally did not protect architectural works. Building owners instead used the Act's protection for "pictorial, graphic, and sculptural works." 17 U.S.C. § 102(a)(5) (1988). While this covered

27

architectural *drawings*, we had suggested that "one may construct a house which is identical to a house depicted in copyrighted architectural plans" without violating the Copyright Act so long as the copier did not use copied plans. *Robert R. Jones Assocs., Inc. v. Nino Homes*, 858 F.2d 274, 280 (6th Cir. 1988). In 1990, however, Congress extended copyright protection to "architectural works." Architectural Works Copyright Protection Act, Pub. L. No. 101-650, §§ 701–706, 104 Stat. 5089, 5133–34 (1990); 17 U.S.C. § 102(a)(8). And it allowed a copyright owner to sue for infringement even if the infringer copied a house without using blueprints. *See T-Peg, Inc. v. Vt. Timber Works, Inc.*, 459 F.3d 97, 109–10 (1st Cir. 2006). If Congress had been concerned that infringing buildings would involve high costs—making it unfair to award revenues as profits unless an infringer proves otherwise—it would have eliminated the burden-shifting framework for architectural works. But it did nothing to alter § 504(b)'s approach to profits in 1990.

One last point. My colleagues remand the case for the district court to "calculat[e] an appropriate remittitur" or "retry the damages issue." Majority Op. 20. How should the court decide a number for Reda's expenses without adequate evidence of Reda's expenses? All agree that the jury could reasonably reject Reda's spreadsheet, so I do not think this spreadsheet can provide a reliable evidentiary source. I would also think the district court should not rely on the 94 receipts that Reda belatedly produced because the court has already excluded those receipts as a discovery sanction. With an inaccurate spreadsheet and few receipts, it is anyone's guess what evidence the district court should use to make its decision. And that is just what the district court will likely have to do in the end—guess. This uncertainty confirms "the perils of straying from the statutory path." *Blackman*, 800 F.2d at 1163.

I would affirm the judgment and so I respectfully concur in part and dissent in part.

28